Nos. 25-3868, 25-5609 and 25-5769

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DISABILITY RIGHTS OREGON; METROPOLITAN PUBLIC DEFENDER; A. J. MADISON,

Plaintiffs - Appellees,

v.

Doctor SEJAL HATHI, in her official capacity as Director of the Oregon Health Authority; SARA WALKER, in her official capacity as Interim Superintendent of the Oregon State Hospital,

Defendants - Appellants.

# APPELLANTS' BRIEF

Appeal from the United States District Court
for the District of Oregon

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
LEIGH A. SALMON #054202
Senior Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
leigh.a.salmon@doj.oregon.gov

Attorneys for Appellants

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION ..........................................................3

STATEMENT OF THE ISSUES ..............................................................4

STATEMENT OF THE CASE ..................................................................5

I. 2002–2018: A federal permanent injunction constrains OSH's authority to treat aid-and-assist patients, and OSH maintains compliance for over 16 years. .......................................6

II. 2018–2025: OSH falls out of compliance with the permanent injunction after a surge in aid-and-assist orders from state trial courts before regaining compliance. .......................8

A. OSH experiences a surge in commitment orders and deals with the COVID-19 pandemic.................................... 8

B. OSH regains compliance with the permanent injunction in late 2023 despite tremendous resistance from mental-health and criminal-justice stakeholders. ...... 10

C. The district court expresses impatience after six months of noncompliance and proposes an order of contempt.......................................................................... 15

III. 2025: The district court holds OSH in contempt based on non-record evidence and appoints a court monitor sua sponte. ........................................................................16

A. OSH remains in "substantial compliance" with Dr. Pinals's recommendations.......................................... 17

B. OSH raises a substantial-compliance defense, arguing that it had taken all reasonable steps to comply. ................ 21

C. Relying on information outside of the evidentiary record, the district court finds OSH in contempt................ 23

D. The district court holds OSH financially responsible

for delays caused by jails' refusals to provide transportation to the state hospital. .................................... 27

SUMMARY OF THE ARGUMENT ..........................................................28

STANDARD OF REVIEW ......................................................................29

ARGUMENT .........................................................................................30

I. The district court erred by finding OSH in contempt and by imposing substantial fines. ..........................................................30

A. The district court abused its discretion and violated basic due-process principles by relying on information outside the record to find OSH in contempt. ...................... 30

B. The contempt order does not clearly set forth conditions by which the contempt may be purged. ............ 38

C. The district court failed to provide a reasoned explanation for the imposition of serious and substantial fines................................................................ 39

D. The district court abused its discretion by making OSH financially responsible for delays outside of its control. ........................................................................ 45

II. The remedial relief ordered by the district court lacks the requisite specificity for injunctive relief. .......................................47

III. The district court erroneously failed to establish parameters for the role of court monitor and to provide a mechanism for reviewing her decisions...............................................................52

CONCLUSION .......................................................................................57

# TABLE OF AUTHORITIES

## Cases Cited

*Armstrong v. Brown*,
768 F.3d 975 (9th Cir. 2014) ........................................ 54, 55, 56, 57

*Balla v. Idaho State Bd. of Corr.*,
869 F.2d 461 (9th Cir. 1989) .................................................. 48, 52

*Bloom v. State of Ill.*,
391 U.S. 194 (1968) ...............................................................1

*Bowman v. Walker*,
Case No. 3:21-cv-01637 (D. Or.) ............................................ 25, 26

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025) ............. 4, 21, 29, 30, 31, 38, 40, 44, 45, 52

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ...............................................47

*Evans v. Williams*,
206 F.3d 1292 (D.C. Cir. 2000) ..............................................34

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters*,
415 U.S. 423 (1974) ...............................................................48

*Green v. United States*,
356 U.S. 165 (1958) ...............................................................34

*In re Crystal Palace Gambling Hall, Inc.*,
817 F.2d 1361 (9th Cir. 1987) ...............................................31

*In re Soares*,
107 F.3d 969 (1st Cir. 1997) ...............................................47

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994) ............................................... 1, 33, 34, 36

*Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*,
389 U.S. 64 (1967) ...............................................................49

*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024) ................................. 30, 53, 54, 55, 56, 57

*Oregon Advoc. Ctr. v. Allen*,
No. 3:02-CV-339-MO, 2019 WL 13215534 (D. Or. Oct. 28, 2019).........8

*Oregon Advocacy Center v. Allen*,
No. 20-35540, 2021 WL 3615536 (9th Cir. Aug. 16, 2021)................9, 42

*Oregon Advocacy Center v. Mink*,
322 F.3d 1101 (9th Cir. 2003)....................................................... 6, 7, 41

*Oregon Advocacy Ctr. v. Mink*,
2002 WL 35578910 (D. Or. May 10, 2002)................................. 7, 25, 26

*Reilly v. United States*,
863 F.2d 149 (1st Cir.1988) ..................................................................54

*Rizzo v. Goode*,
423 U.S. 362 (1976) ..............................................................................1

*Schmidt v. Lessard*,
414 U.S. 473 (1974) ............................................................................48

*SEC v. Elliott*,
953 F.2d 1560 (11th Cir. 1992).............................................................54

*Shew v. Brownell*,
219 F.2d 301 (9th Cir.1955)..................................................................37

*Shuffler v. Heritage Bank*,
720 F.2d 1141 (9th Cir. 1983)...............................................................40

*State v. Chureau*,
Case No. 24CN00829.............................................................................14

*State v. Eurto*,
Case No. 24CN00830.............................................................................14

*State v. Matteucci*,
Case No. 24CN00828.............................................................................14

*State v. Velasquez-Sanchez*,
Case No. 20CR08901 .............................................................................14

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992)................................................. 4, 30, 31, 40

*Taggart v. Lorenzen*,
587 U.S. 554 (2019) ........................................................... 39, 40, 43, 48

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
No. C14-1178-MJP, 2016 WL 3632486 (W.D. Wash. July 7, 2016),
*clarified on denial of reconsideration*,
2016 WL 4384861 (W.D. Wash. Aug. 17, 2016) ...................................41

*Trueblood v. Washington State DSHS*,
Case No. 14-CV-01178 (W.D. Wash.)................................ 10, 41, 42, 43

*United States v. Bright*,
596 F.3d 683 (9th Cir. 2010).................................................................38

*United States v. Garcia*,
997 F.2d 1273 (9th Cir. 1993)...............................................................37

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009)......................................................... 31, 37

*United States v. Litwin*,
972 F.3d 1155 (9th Cir. 2020)...............................................................38

*United States v. Page*,
661 F.2d 1080 (5th Cir. 1981)...............................................................37

*United States v. Walker*,
601 F.2d 1051 (9th Cir.1979)................................................................37

*Whittaker Corp. v. Execuair Corp.*,
953 F.2d 510 (9th Cir. 1992).................................................................45

## Constitutional and Statutory Provisions

28 U.S.C. § 1291.........................................................................................3

28 U.S.C. §§ 1331 and 1343........................................................................3

Or. Laws 2025, ch. 559 §§ 43–49...............................................................50

Or. Laws 2025, ch. 561.................................................................................45

Or. Laws 2025, ch. 587 § 9..........................................................................45

Or. Laws 2025, ch. 630 § 1(5)(a)(C) ...........................................................45

Or. Laws, 2025, ch. 470 §§ 1–2...................................................................45

Or. Rev. Stat. § 137.700(2)...........................................................................11

Or. Rev. Stat. § 161.370..................................................................................7

Or. Rev. Stat. § 161.370(3) (1999),
*amended by* 1999 Or. Laws Ch. 931 §§ 2–3 ..............................................7

## Other Authorities

4 Charles A. Wright and Arthur R. Miller,
*Federal Practice and Procedure* § 1017 (4th ed.) ....................................31

Charles A. Wright and Arthur R. Miller,
*Federal Practice and Procedure* § 2960 (3d ed. 2013) ............................48

Fed. R. App. P. 10(e)(1).........................................................................37

Fed. R. Civ. P. 53(b)(2) .........................................................................53

Fed. R. Civ. P. 53(f)...............................................................................53

Fed. R. Civ. P. 53(f)(1) ..........................................................................53

Fed. R. Civ. P. 65(d) ..............................................................................47

Governor Kotek's Signing Letter,
House Bill 2005 (July 24, 2025), *available at*
https://www.oregon.gov/gov/Documents/HB_2005_Signing_Letter.pdf
.........................................................................................................50

Senate Bill 219 (2023) ....................................................................... 13, 50

# APPELLANTS' BRIEF

## INTRODUCTION

It has long been recognized "that the contempt power" is "uniquely" susceptible to abuse. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (cleaned up; citing *Bloom v. State of Ill.*, 391 U.S. 194, 202 (1968)). "Unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Id*. That "fusion of legislative, executive, and judicial powers summons forth ... the prospect of the most tyrannical licentiousness." *Id*. (cleaned up). Procedural protections are imperative to guard against such abuses. *See id*. at 832-34. And when fashioning remedies, federal courts must consider principles of federalism and the wide latitude state governments have in managing their own internal affairs. See *Rizzo v. Goode*, 423 U.S. 362 (1976).

The district court's actions in this case contravene those core principles of federalism and the separation of powers. For over 16 years, the Oregon Health Authority (OHA) and the Oregon State Hospital (OSH) remained in compliance with a permanent injunction requiring hospital admission of criminal defendants in pretrial confinement within seven days of a state court

order finding the defendant unable to aid and assist in their defense.[1] When OSH fell out of compliance because of a surge of state court commitment orders and the COVID-19 pandemic, it worked diligently with a court-appointed neutral expert, implementing the expert's expansive recommendations and regaining compliance. But when OSH once again experienced a record number of commitment orders from state trial courts and similarly fell out of compliance, OSH was not afforded the same opportunity. Instead, within months, a district court judge newly assigned to the case held OSH in contempt, appointed a court monitor *sua sponte*, and assigned to the monitor essentially unlimited authority, including the calculation and spending of contempt fines going forward.

Those actions constitute an abuse of discretion, and this Court thus should reverse. In particular, the district court erred by (1) finding contempt based on non-record evidence and *ex parte* communications; (2) failing to specify the conditions by which OSH can regain compliance; (3) imposing contempt fines based on distinct facts and conclusions from a case with different parties in another state; (4) imposing contempt fines on OSH for

---

[1] Unless context requires otherwise, this motion uses "OSH" to refer to both the Oregon Health Authority and the Oregon State Hospital. Plaintiff Metropolitan Public Defender (MPD) took no position on DRO's motion for contempt but joined DRO's request for a further remedial order. (ECF 557).

actions of entities that OSH does not control; (5) issuing a remedial order that lacks specificity beyond requiring "reasonable" efforts; and (6) delegating the judicial determination of compliance and contempt fines to a nonjudicial court monitor.

## STATEMENT OF JURISDICTION

The district court has jurisdiction over this civil rights action under 28 U.S.C. §§ 1331 and 1343. The judgment and a permanent injunction were entered in 2002. (4-ER-47, 51). On June 6, 2025, the district court issued an Opinion and Order ("the contempt order") finding OSH in contempt for not having taken "all reasonable steps" to comply with the permanent injunction and imposing sanctions. (1-ER-20–39). OSH timely appealed on June 17, 2025. (4-ER-742). On August 8, 2025, the district court issued an Opinion and Order determining the calculation of the contempt fines. (1-ER-6–19). OSH timely appealed on August 27, 2005. (4-ER-739). On September 4, 2025, the district court entered a First Judgment Regarding Contempt Fines, ordering OSH to pay contempt fines for the period of June 7, 2025, through July 14, 2025. (1-ER-4–5). OSH timely appealed on September 9, 2025. (4-ER-736). This court consolidated the three appeals on September 29, 2025.

This Court has jurisdiction under 28 U.S.C. § 1291, as a post-judgment civil contempt order imposing sanctions is a final appealable order. *Coleman v.*

*Newsom*, 131 F.4th 948, 955 (9th Cir. 2025); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 854 (9th Cir. 1992).

## STATEMENT OF THE ISSUES

1. Substantial compliance with a court order is a defense available to an alleged contemnor that has taken all reasonable steps to comply with the applicable order. Did the district court abuse its discretion by relying almost exclusively on information outside of the evidentiary record to reject OSH's substantial-compliance defense?

2. Because the purpose of civil contempt is to coerce compliance, a finding of contempt must clearly specify the conditions by which the contempt may be purged. Did the district court abuse its discretion by ordering that the contempt will be purged only upon a showing that it has established the defense of "substantial compliance"?

3. District courts must engage in a "reasoned consideration" of various criteria justifying the imposition of contempt fines. Did the district court abuse its discretion by failing to explicitly consider those criteria and by instead adopting reasoning from a different case involving materially distinct circumstances?

4. The purpose of a civil sanction is to coerce compliance with a court order, not as a punitive measure. Did the district court abuse its discretion

by imposing sanctions on OSH for conduct committed by financially and politically distinct entities over which OSH has no control?

5. Remedial and injunctive orders must be both specific and definite. Did the district court abuse its discretion by issuing a remedial order that requires OSH to "use all reasonable efforts" to achieve amorphous goals, such as "reduce delays" and hire "sufficient" staff?

6. A district court exercising its equitable powers to appoint a court monitor cannot delegate judicial functions to a nonjudicial officer. Did the district court abuse its discretion by appointing a court monitor without establishing any parameters on her authority and by subsequently instructing her to be the sole and final arbiter of disputes over the amount of contempt fines owed?

## STATEMENT OF THE CASE

This appeal concerns an order of contempt entered by a district court judge against OSH in 2025, on a permanent injunction entered and largely overseen by a different district court judge since 2002, with which OSH has mostly remained in full or substantial compliance for the entirety of its duration. To orient the Court, OSH thus will provide an overview of: (1) the first 16 years of the injunction, during which OSH maintained compliance; (2) the next 7 years of the injunction, during which OSH periodically fell out of compliance

due to unforeseen circumstances before regaining full or substantial compliance; and (3) the district court's sua sponte appointment of a court monitor and its order of contempt, despite a neutral expert advising against doing so.

## I. 2002–2018: A federal permanent injunction constrains OSH's authority to treat aid-and-assist patients, and OSH maintains compliance for over 16 years.

Plaintiffs filed suit in 2002, alleging that defendants were "violating mentally incapacitated [criminal] defendants' due process rights by unreasonably delaying such [criminal] defendants' transfer from county jails to OSH for treatment." *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1105 (9th Cir. 2003). The district court concluded that incapacitated pretrial detainees have a substantive and procedural due process right "to 'reasonably timely transport to a treatment facility.'" *Oregon Advocacy Center*, 322 F.3d at 1119. And, by then-existing statute, OSH was "solely responsible for the timely treatment of incapacitated criminal defendants so that they may become competent to stand trial." *Id*. at 1119-20. The district court thus entered a permanent injunction, ordering OSH to provide "full admission" for treatment "not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial," commonly referred to as ".370 orders," because they derive from the authority given to state trial courts by Or.

Rev. Stat. § 161.370 to commit incompetent pretrial detainees to OSH for competency restoration. *Oregon Advocacy Ctr. v. Mink*, 2002 WL 35578910, at *7 (D. Or. May 10, 2002).

As pertinent here, the district court's injunction was based, in part, on the specific factual finding that jails would be able to transport criminal defendants to OSH within 24 hours of the issuance of a trial court's commitment order. *Id.* at *4; *see also id.* at *6 (stating that incompetent criminal defendants "should be detained [in jail] only for that period of time necessary to identify the person, determine the appropriate legal status, and effectuate transport"); Or. Rev. Stat. § 161.370(3) (1999), *amended by* 1999 Or. Laws Ch. 931 §§ 2–3 (requiring that "the defendant shall be transported to the hospital * * * within seven days after the court's determination unless doing so would jeopardize the health or safety of the defendant or others"). This Court then affirmed the district court's order of permanent injunctive relief. *Oregon Advocacy Center*, 322 F.3d at 1123.

For 17 years, there was no direct district court involvement in the case. To be sure, the district court retained jurisdiction over the injunction under the purview of the Honorable Owen M. Panner. But the parties resolved any disputes without court involvement, and OSH largely remained in compliance with the injunction, admitting aid-and-assist defendants within seven days of a state trial court's order to do so.

## II. 2018–2025: OSH falls out of compliance with the permanent injunction after a surge in aid-and-assist orders from state trial courts before regaining compliance.

### A. OSH experiences a surge in commitment orders and deals with the COVID-19 pandemic.

After more than 16 years of full compliance, OSH fell out of compliance with the permanent injunction in 2018. In particular, OSH became unable to timely admit aid-and-assist patients due to a substantial and unexpected increase in the number of commitment orders issued by state courts. In May 2019, plaintiffs filed a motion to hold OSH in contempt. (ECF 85, 91). The case was reassigned to the Honorable Michael W. Mosman. (ECF 99).

The district court, Judge Mosman, denied the motion for contempt, (4-ER-719), and OSH regained compliance in July 2019, (4-ER-715). *See also Oregon Advoc. Ctr. v. Allen*, No. 3:02-CV-339-MO, 2019 WL 13215534, at *1 (D. Or. Oct. 28, 2019) (unpublished order). That compliance was the result of several factors, including the state's passage of legislation that tied "admission to OSH to acuity and seriousness of offense," as well as a nearly $5 million increase per biennium that funded additional community restoration services. (4-ER-715). OSH also improved the admissions process, hired additional forensic evaluators, and increased its "capacity for Aid and Assist patients from 229 in October 2018 to 286" as of September 2019. (4-ER-716). *See also Oregon Advoc. Ctr.*, 2019 WL 13215534, at *3–4 (district court finding that

OSH "started working on solving their capacity issue that led to their noncompliance well in advance of May 2019" and that OSH used emergency funding to create additional treatment beds for community restoration).

Then, in early 2020, the COVID-19 pandemic struck. Due to the unprecedented circumstances and the need to prevent the spread of disease within the hospital, the district court modified the injunction, temporarily lifting the seven-day admission requirement until it was "'medically safe for OSH to begin accepting patients in the normal course again." *Oregon Advocacy Center v. Allen*, No. 20-35540, 2021 WL 3615536, at *1 (9th Cir. Aug. 16, 2021) (unpublished decision) (describing circumstances as "an unprecedent time" and finding that "OSH met its burden to demonstrate that the COVID-19 pandemic made compliance with the [permanent] injunction more onerous").

The district court ended the modification to the permanent injunction in December 2021, (4-ER-713), and the parties engaged in substantial and complex negotiations to regain compliance with the permanent injunction, including "multiple hearings," discovery, "conferences, appeals, and attempts at settlement," (4-ER-654–55). *See also Oregon Advocacy Center*, No. 20-35540, 2021 WL 3615536, at *1.

### B. OSH regains compliance with the permanent injunction in late 2023 despite tremendous resistance from mental-health and criminal-justice stakeholders.

In December 2021, as the state responded to the ongoing pandemic, the parties reached an interim agreement to retain a neutral expert, Dr. Debra A. Pinals, to "provide recommendations to address OSH's capacity issues and create a plan for both long- and short-term compliance" with the permanent injunction. (4-ER-655, 706–10). Dr. Pinals had extensive practical and legal experience working with the State of Michigan's mental health system and also served as a psychiatric expert to the court monitor in similar aid-and-assist litigation against the State of Washington's mental health system, *Trueblood v. Washington State DSHS*, Case No. 14-CV-01178 (W.D. Wash.).[2] The parties further agreed on what information would be shared with Dr. Pinals and how her recommendations would be implemented. In short, the parties would meet and confer to determine, collaboratively, what should and could be done to

---

[2] In particular, "Dr. Pinals is the Medical Director of Behavioral Health and Forensic Programs for the Michigan Department of Health and Human Services and is the Director of the Program in Psychiatry, Law & Ethics and Clinical Professor of Psychiatry at the University of Michigan Medical School, and Clinical Adjunct Professor at University of Michigan Law School." (4-ER-707). "She has a research background in the legal regulation of psychiatric practice, law and psychiatry, justice and behavioral health, public mental health services, specialty courts, and jail diversion, among other relevant areas of interest." (*Id*.).

move OSH back toward compliance amidst a pandemic. (4-ER-706–10). The parties then did exactly that.

In particular, Dr. Pinals "spent over six months reviewing OHA data, meeting with a broad group of stakeholders from various constituencies, and writing two reports that totaled over fifty pages[.]" (4-ER-660). Those two reports—issued in January and June 2022—"describe[d] what had been done and what steps should be taken to end the constitutional violations." (*Id*.). Dr. Pinals recommended (among other things) imposing strict limits on the admission of patients to OSH and on the maximum duration of commitment, to maximize OSH's ability to admit new aid-and-assist patients within seven days as the permanent injunction required.[3] (*See generally* 3-ER-474–89).

---

[3] Those limits, which prioritized patients with the highest needs who were most likely to benefit from restoration services at OSH, included the following:

- OSH must admit aid-and-assist patients and persons who have been adjudged guilty except insane (GEI) according to their place on the admissions wait list or the relevant expedited admissions policy;

- Notwithstanding that state law might otherwise allow longer commitments, the maximum duration of commitment for aid-and-assist patients charged with misdemeanors is 90 days; for felonies, six months; and for felonies listed in Or. Rev. Stat. § 137.700(2), one year;

*Footnote continued…*

Dr. Pinals also recommended imposing similar time limits on community restoration through legislation. (3-ER-482).

In response to plaintiffs' unopposed motion, (4-ER-689–702), the district court entered a remedial order on September 1, 2022, directing the "implementation of the neutral expert's recommendations, including recommendations that arguably override state law," such as limiting admissions and restricting the amount of time a person could remain committed at OSH. (4-ER-668–71 (Order to Implement Neutral Expert's Recommendations)).[4]

---

- Contiguous consecutive periods of restoration are barred unless there are new criminal charges after the end of the initial period of restoration;
- OSH may not admit civilly committed persons unless they meet criteria for expedited admissions;
- OSH may not admit transfers from the Oregon Youth Authority, with limited exceptions; and
- OSH may not admit transfers from the Department of Corrections unless they met expedited admission criteria.

(*See* 4-ER-669–71).

[4] On May 10, 2023, the district court modified its remedial order regarding hospital admissions in its Amended Order to Implement Neutral Expert's Recommendations (4-ER-644–52), and it modified it again on July 3, 2023, in its Second Amended Order to Implement Neutral Expert's Recommendations (4-ER-627–43). The basic parameters, however, remain in place. (*See* 1-ER-38 (extending Second Amended Order to Implement Neutral Expert's Recommendations)).

Those time limits effectively prioritized patients with the highest need who were most likely to benefit from rehabilitation services at OSH, regardless of state statutes and state-court orders to the contrary. (4-ER-669–71). OSH, however, attempted without success to secure legislation that would have codified the admission and discharge limitations on inpatient restoration adopted by the district court, as well as similar limitations on community-based restoration. *See* Senate Bill 219 (2023).

The limitations on hospitalization received tremendous pushback from numerous stakeholders, some of whom "actively oppos[e]d necessary legislative action," significantly hindering OSH's efforts in achieving compliance. (*See* 1-ER-30; 2-ER-71–72; 4-ER-625-26). Simultaneously, state court judges issued orders prohibiting county sheriffs from transporting patients back to the county jail after they reached the inpatient restoration limits, preventing OSH from discharging those patients to comply with the remedial order and requiring repeated intervention by the district court at OSH's request. (*See, e.g.*, 4-ER-614–17, 625–26). Indeed, the district court found that the state trial court orders had been issued "for the purpose of thwarting" the federal remedial orders and, on September 11, 2023, issued an Order Determining Supremacy Clause Issues, declaring them "void" "to the extent" that they "tend

to prohibit, to restrict, or to impair the release of detainees otherwise subject to release under this Court's orders." (4-ER-625-26).

During this time, criminal defendants also began filing contempt actions against OSH in state court, alleging that OSH should be held in contempt for failing to admit them within seven days of the .370 order. *See, e.g.*, *State v. Velasquez-Sanchez*, Case No. 20CR08901; *State v. Matteucci*, Case No. 24CN00828; *State v. Chureau*, Case No. 24CN00829; *State v. Eurto*, Case No. 24CN00830. Dr. Pinals stated that such contempt proceedings took "time away from clinical services" and "created significant work," but "did not necessarily expedite admissions." (3-ER-462).

Notwithstanding those challenges, OSH worked diligently with Dr. Pinals to implement her "expansive" recommendations—recommendations that crossed "multiple systems" and involved "numerous stakeholders." (2-ER-135). Dr. Pinals set a "benchmark goal" of achieving an "[a]verage wait time to admission" of seven days or less by February 2023, although she later questioned whether that benchmark was "set with expectations that were too high, given the challenges at the time." (3-ER-487, 499–500). Regardless, because of the remedial orders and the "many efforts" "put forward," OSH regained compliance with the permanent injunction for approximately six to seven months from late 2023 to early 2024—an accomplishment that "was

enviable by other states who are still struggling and have not achieved that level of compliance." (3-ER-388, 396, 523).

In March 2024, the case was reassigned from Judge Mosman to the Honorable Adrienne C. Nelson, at which point OSH was back in compliance with the injunction. (ECF 476). However, by the end of May 2024, state trial courts had issued "record numbers" of .370 orders "out of the blue," and OSH again fell out of compliance. (2-ER-125, 175; 3-ER-519, 589).

### C. The district court expresses impatience after six months of noncompliance and proposes an order of contempt.

In November 2024, after six months of efforts to regain compliance, the district court expressed impatience with the pace of progress during a status conference—so much so that the court implied that plaintiffs should file a motion to hold OSH in contempt with the two-decades-old injunction. (*See, e.g.*, 3-ER-435–36, 439, 450–51). Both plaintiff groups, DRO and MPD, expressed skepticism that holding OSH in contempt would be an effective means of achieving compliance because the money to pay contempt fines would come out of OSH's existing budget absent a future legislative appropriation. (3-ER-438–39). Dr. Pinals echoed those concerns, stating that contempt would not "necessarily get [OSH] into compliance faster." (3-ER-446). She also stated that the existing situation is "complex" and "takes time" to resolve. (3-ER-440). Specifically, Dr. Pinals "conservatively" estimated that it would take an

additional "four to six months" to regain compliance after the unexpected surge of .370 orders from May and June 2024. (3-ER-445).

The district court made no rulings at the end of the November 2024 status conference. Instead, the court implied that it would hold OSH in contempt unless it regained compliance within "a few months." (3-ER-450–51).

## III. 2025: The district court holds OSH in contempt based on non-record evidence and appoints a court monitor sua sponte.

Not long after the November status conference, on January 7, 2025, DRO moved to hold OSH in contempt for noncompliance with the permanent injunction. (ECF 540). Plaintiff Metropolitan Public Defender (MPD) took no position on DRO's motion for contempt but joined DRO's request for a further remedial order. (ECF 557). The district court held a status conference on January 24, 2025, that included testimony from Dr. Pinals and three other witnesses in response to a list of questions posed by the court two days prior. (*See* 4-ER-619). The district court subsequently held a two-day evidentiary hearing on the contempt motion in March 2025. The parties submitted exhibits, several witnesses testified, and testimony from the January status conference

was incorporated into the record. (2-ER-149; 1-ER-29 (incorporating testimony from status conference)).[5]

### A. OSH remains in "substantial compliance" with Dr. Pinals's recommendations.

In January 2025, Dr. Pinals testified that, despite not admitting aid-and-assist individuals within seven days, OSH remained in "substantial compliance" with most, if not all, of her recommendations. (3-ER-386–91; *see also* 3-ER-547–86). As backdrop, Dr. Pinals had a systemic view of the state's overall mental health system. Many of her recommendations, and most of OSH's accomplishments, focused on increasing "throughput," or flow through the restoration system to free up treatment beds at the hospital for those most in need. (*See*, *e.g.*, 2-ER-68–69, 74, 87, 100-01).

For example, on Dr. Pinals's recommendation, OSH had created and maintained a data dashboard and hired an additional data analyst to better track system metrics, (3-ER-386–87); developed a manual for community restoration programming that, although not yet finalized, had received "rave reviews" from community mental health systems on its helpfulness, (3-ER-388); established an Extended Care Management Unit to facilitate community placements for

---

[5] The district court issued an order on January 22, 2025, directing OSH to present testimony on January 24, 2025, in response to a list of questions. (4-ER-619).

individuals who no longer needed a hospital level of care, (3-ER-389); launched a community navigator pilot program to help reduce recidivism, (3-ER-390–91; *see also* 2-ER-75–76); improved coordination with the state agency charged with oversight of individuals found guilty except for insanity, (3-ER-391); and continued distributing grants and other funds to create 538 additional community treatment beds across the state by December 2026, (3-ER-592; 3-ER-537–38).[6]

It bears emphasizing that a central obstacle to compliance is the lack of community placements for individuals ready to be discharged from the hospital. (*See* 2-ER-73–74). As a result, the above-described measures recommended by Dr. Pinals and implemented by OSH were designed to facilitate movement into those placements. For example, the Extended Care Management Unit (ECMU) repurposed five full-time staff positions to coordinate with counties on placing individuals on the ready-to-place list into the community. (3-ER-339–40; 2-ER-93–94). To that end, ECMU staff "understand all of the intricacies of

---

[6] Increasing community capacity is a lengthy process that depends on legislative funding, local permitting and zoning requirements, and construction availability. (*See* 3-ER-332, 338–39; 2-ER-233). As such, the process typically takes "12 to 24 months" before additional beds become available. (3-ER-332, 338–39). The additional 538 treatment beds referenced above is the cumulative sum of confirmed and anticipated additions between the second quarter of 2023 and the fourth quarter of 2026. (3-ER-592; *see also* 3-ER-326 (noting capacity building efforts over past "several years")).

funding and rules" and "bring every mechanism" available, "including offering funding" and "looking at other elements in the delivery system to get the people discharged." (2-ER-94).

Relatedly, the community navigator pilot program consists of individualized support in the community for up to six months following discharge. (3-ER-390–91; 2-ER-74–77). Services include connecting the individual with treatment and other available supports. (2-ER-75). Dr. Pinals believed that increasing the aid-and-assist population's "community tenure and stability" would reduce recidivism rates, thereby decreasing the number of mentally ill individuals being cycled through the criminal justice system, which, in turn, would reduce "the referral rate for aid and assist." (2-ER-77–80). She cautioned against expanding the pilot program, however, until more data about its efficacy is available. (2-ER-76–77).

Notably, Dr. Pinals also acknowledged the complexity of the systems behind the areas of OSH's noncompliance, some of which lay outside of OSH's control. (*See*, *e.g.*, 3-ER-394, 396-99). When asked to identify the areas where OSH had "not shown compliance with" her recommendations, Dr. Pinals stated that the manual for community restoration had not yet been finalized and that legislation "has not [yet] been passed." (3-ER-393–94). She explained that there were many barriers to regaining compliance and that "not all of them are

within [OSH's] control." (3-ER-399). She emphasized the need to be "thoughtful and careful about movement of humans and supporting their needs best across systems * * * to ensure that risk doesn't pop up in other places and spaces inadvertently." (3-ER-399–400). As a result, Dr. Pinals cautioned that compliance takes "more time than people often … can tolerate and understand." (3-ER-399).

At the January status hearing, the district court also directed the parties to address whether Dr. Pinals's role should be "changed to that of a court monitor." (*See* 4-ER-619). MPD and DRO indicated general agreement with such a change. (3-ER-377, 384–85). OSH indicated that it was "prepared to defer" to the district court's "preference on whether" Dr. Pinals's role "should be elevated," but expressly requested an opportunity to be heard on the parameters of a new role and "what her scope of work would be before a final decision [was] made on that." (3-ER-363–64).

Finally, it bears noting that the most direct means of achieving compliance with the seven-day admission requirement would be to increase hospital capacity, rather than community capacity. Neither the plaintiffs nor Dr. Pinals has recommended that remedy.

### B. OSH raises a substantial-compliance defense, arguing that it had taken all reasonable steps to comply.

The contempt hearing took place in March 2025. Although OSH conceded that it was not in compliance with the seven-day admission requirement under the permanent injunction, it raised the defense of substantial compliance and argued that it had taken all reasonable steps to comply. *See Coleman*, 131 F.4th at 956 (explaining that substantial compliance with a court order is a defense to contempt and is available when the party has "taken all reasonable steps to comply"). As indicated, Dr. Pinals's role as the court-appointed neutral expert was to provide recommendations for overcoming barriers and achieving compliance. (4-ER-706–07). Consistent with OSH's defense, Dr. Pinals testified about her "expansive" recommendations for immediate and systemic reform and OSH's diligent efforts to implement them. (*See, e.g.*, 2-ER-134–35; 3-ER-455–89 (Dr. Pinals's "Neutral Expert Second Report"); 3-ER-490–511 (Dr. Pinals's "Neutral Expert Third Report"); 3-ER-512–46 (Dr. Pinals's "Neutral Expert Tenth Report"); 3-ER-547–86 ("Project Tracker of Neutral Expert's Recommendations")).

Specifically, Dr. Pinals believed that OSH was "working diligently and in good faith to implement [her] recommendations," as well as to address barriers to implementation beyond OSH's control. (2-ER-135–36). For example, she opined that "community expansion is one of the key elements to compliance,"

but acknowledged that such expansion was dependent on legislative action and participation by many other stakeholders. (2-ER-90–91; *see also* 3-ER-397–99). And while community expansion generally has been supported, many stakeholders strenuously resisted other efforts to regain compliance, primarily durational limitations on hospital admissions, going so far as to "actively oppos[e]" the "necessary legislative action." (2-ER-71–72, 98–99; 1-ER-30 (district court noting active opposition to legislation which was "thwarting the Court's efforts to aid [OSH] in achieving compliance")).

But there was no dispute that, as discussed above, OSH regained compliance for a period of six to seven months in 2023–2024, and only lost compliance because "referral numbers * * * surprisingly out of the blue rose almost 20 percent." (2-ER-65, 125; 3-ER-519 (Dr. Pinals documenting that "May and July [2024] concluded with record numbers of restoration orders (127 and 128, respectively)"). Not even Dr. Pinals had anticipated the "significant" increase in .370 orders that derailed OSH's compliance status in 2024 and ultimately led to the contempt proceedings. (*See* 2-ER-125). She explained that it is "difficult to predict" when OSH may regain compliance because there are "many factors that are unpredictable." (2-ER-125–26). Further, the cooperation of "many other stakeholders" is "required to make it all work"—something the district court appeared to recognize. (2-ER-90; 1-ER-35–36

(district court observing that “other stakeholders may certainly affect defendants’ ability to achieve and maintain compliance”)). Ultimately, Dr. Pinals did not support contempt fines for noncompliance with the permanent injunction, explaining that the money would “come out of other services if there [were] not additional [legislative] appropriations” to OSH. (2-ER-136 (Dr. Pinals stating that “money doesn’t grow from trees”)).

At the hearing’s conclusion, the district court directed the parties to confirm which exhibits were offered so that it would “know what is in the record.” (2-ER-313). The district court subsequently entered the Clerk’s List of Exhibits and Witnesses, (ECF 587), and Minutes of Proceedings stating that it had taken the case under advisement, (4-ER-618).

### C. Relying on information outside of the evidentiary record, the district court finds OSH in contempt.

Three months later, on June 6, 2025, the district court issued an Opinion and Order (the contempt order) finding OSH in contempt for not having taken “all reasonable steps” to admit pretrial detainees within seven days of a .370 order. (1-ER-20–40). The court imposed “monetary sanctions in the amount of $500 per class member per day * * * until [OSH] achieve[s] substantial compliance” with the permanent injunction, as well as remedial measures. (1-ER-36).

The district court's factual findings underlying the contempt order were based almost exclusively on a report prepared by Dr. Pinals on May 5, 2025, and provided to the district court *in camera* almost four months *after* the January 2025 hearing and two months *after* the March 2025 contempt hearing.[7] (*See* 1-ER-30–33). That report, although publicly available, was not made a part of the evidentiary record, nor were the parties given notice that the district court intended to base its ruling on its contents. In it, Dr. Pinals referenced and relied on events and information that post-dated the evidentiary hearing, (*see, e.g.*, 1-ER-31–32), and provided a list of recommended remedial measures, (*see* 1-ER-39). Moreover, the district court also had at least one *ex parte* communication with Dr. Pinals about the report. (*See* 1-ER-11; ECF 620, Ex. B).[8]

[7] The district court referred to the May 5, 2025, report in the contempt order as the "Eleventh Report" in reference to the fact that it was the eleventh report authored by Dr. Pinals. (1-ER-30). OSH adopts that designation in this brief.

[8] On December 5, 2025—six months after the contempt order was issued—the district court entered a minute order, summarily granting DRO's contested "Motion to Supplement the Record on Appeal" with the Eleventh Report. (ECF 685). The district court offered no explanation. But because DRO's motion focused on the "ministerial matter" of assigning a "docket number" to the report, (ECF 641 at 3), OSH does not understand the district court to have retroactively admitted the Eleventh Report *into evidence*.

The district court's findings based on the Eleventh Report included the purported effect of personnel changes at OSH that postdated the evidentiary hearing; the average wait times for admissions under a .370 order in April 2025; census data for the Northwest Regional Reentry Center (NWRRC) for March and April 2025; and alleged delays or less-than-perfect performance on some of Dr. Pinals's recommendations. (1-ER-31–32). The only findings by the district court that did not rely on the Eleventh Report were the facts of the original permanent injunction and OSH's concession that it was not in compliance with that injunction as of the contempt hearing. (1-ER-30–31).

As noted, the district court imposed monetary sanctions of "$500 per class member per day." (1-ER-36). However, the district court did not otherwise provide guidance on how to calculate the fines. Instead, it ordered OSH to submit "relevant dashboard data pertaining to the average active waiting period for *Mink-Bowman* class members" and a "proposed calculation of contempt fines" on the fifteenth of each month, despite this case not being a class action.[9] (1-ER-36–37). The district court also imposed "remedial

---

[9] The district court and the parties occasionally refer to this case as the "*Mink* case," and to the permanent injunction as "the *Mink* injunction" in reference to one of the originally named defendants, Bobby Mink.

*Bowman* refers to a lawsuit MPD filed in November 2021 on behalf of two criminal defendants who had been found guilty except for insanity (GEI)

*Footnote continued…*

measures" that require OSH to "use all reasonable steps" to accomplish various objectives, such as "reduce delays" and "expedite" discharges, and it ordered OSH to implement some of the recommendations in the Eleventh Report. (1-ER-38–39).

Last, the district court *sua sponte* changed Dr. Pinals's role from a neutral expert to court monitor and granted her the authority to hire staff at OSH's expense. (1-ER-38). The district court stated that the change was "intended to further guide" OSH's efforts toward compliance with the permanent injunction but did not set forth any specific duties or limitations on the court monitor's role. The district court extended for one year the Second Amended Order to Implement Neutral Expert's Recommendations, with the modification that the term "Neutral Expert" be replaced with "Court Monitor." (1-ER-38; 4-ER-627–43).

---

and who had been waiting for admission to OSH since January and March 2021 (as OSH was prioritizing aid-and-assist admissions under the remedial orders). *Bowman v. Walker*, Case No. 3:21-cv-01637 (D. Or). The *Bowman* case was consolidated with this case and stayed. (ECF 240, 244). In the contempt order, the district court collectively referred to incompetent pretrial detainees and convicted GEI defendants awaiting transport to OSH as the "*Mink-Bowman* class members." (1-ER-26). Despite that denomination, it appears that the district court did not intend to include convicted GEI defendants as a "class member" for purposes of the contempt fines. (*See* 1-ER-11 n.7).

### D. The district court holds OSH financially responsible for delays caused by jails' refusals to provide transportation to the state hospital.

Pursuant to the contempt order, OSH submitted a proposed calculation of fines that included all persons ordered committed to OSH under a .370 order, with fines accruing at a rate of $500 per day for each day they waited longer than seven days. (ECF 606). OSH excluded from that calculation any days where it offered an available bed and was ready to admit and provide restoration services, but the jail declined to transport. (ECF 606 at 3). MPD did not object to OSH's proposed calculation; DRO, however, did object, and OSH filed a response. (ECF 618, 623).

The district court issued an order, sustaining DRO's objection. (1-ER-17–18). It held that, if jails were unable to transport pretrial detainees, OSH must work "around those limitations" or "establish[] some other adequate means of transport." (1-ER-18). Establishing a transportation program, however, would require legislative approval to hire at least 12 additional security staff and would cost over $11 million per biennium. (2-ER-192–93; ECF 624, ¶ 8; ECF 626 ¶ 3). OSH appealed that fine order, which was later consolidated with the contempt order on appeal. (4-ER-739).

The district court subsequently issued a minute order (after OSH filed its notice of appeal) excluding "from the calculation of contempt fines days

resulting from court clerks' failure to timely send .370 orders" to OSH and "days resulting from the failure to transport persons from jail to OSH, so long as [OSH] can show they provided timely notice to the county jail, issued a constitutional rights directive to the jail, and informed the Court of the circumstances." (1-ER-3). In a subsequent minute order, the district court indicated that Dr. Pinals alone is responsible for adjudicating whether OSH has made the requisite showing to avoid the imposition of a fine. (1-ER-2). The exclusion did not apply retroactively to the fines that had already accrued.

To date, OSH has paid over $1.9 million in fines. (*See* ECF 656, 690, 701).

## SUMMARY OF THE ARGUMENT

The district court committed a series of compounding errors, any one of which requires reversal. Violating fundamental principles of notice and an opportunity to be heard, the district relied almost exclusively on information that was obtained months after the contested hearing and not made a part of the evidentiary record to hold OSH in contempt and impose coercive *per diem* fines until it achieves "substantial compliance" with the permanent injunction. The district court did not define what constitutes "substantial compliance," making it unknown what benchmark OSH must achieve to purge the contempt. Further, the district court appears to have relied on another court's calculation of fines

without conducting any independent analysis or considering the many material differences between the two cases, and it ordered OSH financially responsible for the actions (or inactions) of independent entities over which OSH has no control.

The district court's remedial order fails to provide the requisite specificity for injunctive relief. OSH should not be in the position of having to speculate about what further "reasonable steps" it must take under the threat of additional contempt proceedings and fines, or what degree of a reduction in delays will be deemed sufficient. And, as drafted, there are no checks on the court monitor's authority and no mechanism for challenging the monitor's decisions, despite her seemingly being responsible for determining in the first instance what constitutes "reasonable steps" for portions of the remedial order.

Those errors constitute an abuse of discretion and require reversal of the contempt order, the remedial order, the order appointing the court monitor, and the order imposing financial liability on OSH for delays related to a county jail's refusal to transport a pretrial detainee to the state hospital.

## STANDARD OF REVIEW

This Court reviews "a district court's factual findings in connection with a contempt order for clear error." *Coleman*, 131 F.4th at 956. It reviews the "district court's contempt finding and imposition of sanctions for abuse of

discretion." *Stone*, 968 F.2d at 856, 861. "[W]hether a district court provided an alleged contemnor due process ... is a legal question subject to *de novo* review on appeal." *Coleman*, 131 F.4th at 956 (cleaned up). The "scope and terms of an injunction" are reviewed "for an abuse of discretion." *Melendres v. Skinner*, 113 F.4th 1126, 1132 (9th Cir. 2024).

## ARGUMENT

### I. The district court erred by finding OSH in contempt and by imposing substantial fines.

#### A. The district court abused its discretion and violated basic due-process principles by relying on information outside the record to find OSH in contempt.

In a contempt proceeding, each party bears a burden of proof that, by definition, requires the submission of evidence upon which the district court must base its decision. *See Stone*, 968 F.2d at 856 n.9. "The moving party has the burden of showing by clear and convincing evidence that the [alleged] contemnors violated a specific and definite order of the court." *Id*. "The burden then shifts to the contemnors" to establish any defenses, such as substantial compliance. *Id*.; *Coleman*, 131 F.4th at 956.

This Court, in turn, reviews the "district court's contempt finding and imposition of sanctions for abuse of discretion." *Stone*, 968 F.2d at 856. A district court "necessarily abuse[s] its discretion if it based its ruling on an erroneous view of the law or a clearly erroneous assessment of *the evidence*."

*See United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (cleaned up; emphasis added); *see also, e.g.*, *Stone*, 968 F.2d at 858 (in contempt proceeding, rejecting argument that was based on "hearsay evidence that was not part of the record below"); *In re Crystal Palace Gambling Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) (in contempt proceeding, rejecting challenge to factual finding that was "strongly supported by the record"). Logically then, a district court also abuses its discretion by basing its ruling on information that was never admitted as evidence, which is what the district court here did. *See also* 4 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1017 (4th ed.) ("[W]hen the original action was governed by the Federal Rules of Civil Procedure, the contempt proceeding designed to enforce the court's order will be as well.").

As discussed, OSH conceded that it was not in compliance with the permanent injunction but argued that it had taken all reasonable steps to comply. *See Coleman*, 131 F.4th at 956 (9th Cir. 2025) (explaining that substantial compliance with a court order is a defense to contempt and is available when the party has "taken all reasonable steps to comply"). During the two-day evidentiary hearing, the district court received evidence, including several of Dr. Pinals's past reports, and testimony from various witnesses. OSH cross-examined Dr. Pinals under oath about those reports and OSH's

compliance with her recommendations and its efforts to achieve compliance. (*See* 2-ER-134–42).

Yet three months later—without giving the parties notice or an opportunity to be heard—the district court rejected OSH's substantial-compliance defense based on findings derived from extra-record information and events that occurred after the contempt hearing. (*See* 1-ER-30–33 (relying on information in the Eleventh Report). Those findings included the purported effect of personnel changes at OSH that postdated the evidentiary hearing; the average wait times for admissions under a .370 order in April 2025; census data for the Northwest Regional Reentry Center (NWRRC); and some delays or less than perfect performance on some of Dr. Pinals's recommendations. (1-ER-31–33). Notably, *no* census data for NWRRC was admitted at the contested evidentiary hearing, yet the district court found—based on the Eleventh Report—that the "census at NWRRC has not consistently been managed to full capacity." (1-ER-32; *compare with* 2-ER-120 (Dr. Pinals's testimony that NWRRC is "full" and would require "a new building to be built" to expand capacity); 3-ER-473 (Dr. Pinals stating that "there could be numerous variables that might make an open bed not available (staffing, infrastructure, acuity)")).[10]

---

[10] NWRRC is a third-party provider that has contracted with OSH to provide community restoration treatment. (3-ER-529). It is not a locked

*Footnote continued…*

The only factual findings that do not rely on the Eleventh Report are the facts of the original permanent injunction and OSH's concession that it was not in compliance with that injunction as of the contempt hearing. (1-ER-30–31).

By relying on *ex parte* communications and information outside of the evidentiary record, the district court ignored basic due-process principles of notice and opportunity to be heard. *Bagwell*, 512 U.S. at 834 (holding that "due process requires the contemnor's rights to notice and a hearing be respected"). "Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding." *Id*.; *see also id*. at 831-32 (explaining that "the contempt power" is "uniquely * * * liable to abuse"). Although the injunction in this case may not be complex, there can be little dispute that achieving compliance is. (*See* 2-ER-59 (MPD describing solutions as "knottingly complex"); 2-ER-89 (Dr. Pinals describing "complex system"); 3-ER-394 (Dr. Pinals describing system as "very complex")). And whether OSH has undertaken all reasonable steps within an exceedingly complex system involving numerous stakeholders requires "elaborate and reliable factfinding"—factfinding that must be based on evidence subjected to the crucible of cross-

---

facility, and it assists convicted offenders "who are reentering after being in carceral settings." (2-ER-199; 3-ER-529). Although NWRRC provides restoration services, those services are not as robust as what would be provided in a secure residential treatment facility. (3-ER-529).

examination. *See Bagwell*, 512 U.S. at 834 (quoting *Green v. United States*, 356 U.S. 165, 217, n. 33 (1958) (Black, J., dissenting), for the proposition that "'[a] *hearing must be held*, witnesses must be called, and evidence taken" for "'[a]lleged contempts committed beyond the court's presence *where the judge has no personal knowledge of the material facts*.'" (emphasis added)). Such procedural protections are especially important where, as here, "a district judge assumes the responsibility to regulate the activities of a large institution and then seeks to identify and punish" contemnors, as that "comes perilously close to fusing the powers which our Constitution separates." *Evans v. Williams*, 206 F.3d 1292, 1297 (D.C. Cir. 2000); *Bagwell*, 512 U.S. at 831 (similar).

To be sure, Dr. Pinals informed OSH that she had emailed her report to the district court. (*See* 1-ER-11). But that did not give OSH notice that the district court intended to consider the report in deciding the pending contempt motion. The district court's reliance on the Eleventh Report marked a significant procedural departure beyond normal expectations of how contested evidentiary proceedings are handled. Before the contempt order, the district court had never taken judicial action based on Dr. Pinals's past reports, all of which were provided to the district court via email, without first providing some opportunity for the parties to provide their position (whether via an unopposed motion following conferral, opportunity for briefing, or a hearing). (*See, e.g.*,

ECF 271 (granting *unopposed motion* to enter remedial order implementing Dr. Pinals's recommendations); ECF 416 (granting *unopposed motion* to amend remedial order)). That history—especially when coupled with the express closure of the evidentiary record, (2-ER-313)—gave OSH no reason to believe that, in rejecting its defense, the district court would rely on extra-record information consisting of hearsay, irrelevant information, and unchallenged opinion from a witness who had previously testified and been subject to cross-examination.

The parties here stipulated to the appointment of Dr. Pinals "as a neutral expert"—not a special master—"*to make recommendations* to address capacity issues at [OSH]." (4-ER-704, 706–07 (emphasis added)). OSH never stipulated to the district court taking unilateral action on any of her reports, and in its initial appointment order the district court defined her role as "managing ongoing discussions between the Plaintiffs and the Defendants and monitoring compliance with the recommendations set forth in" her prior reports. (*See* ECF 251). Although the district court also ordered Dr. Pinals to provide short reports that included recommendations for regaining compliance, (4-ER-704–05), it does not follow that OSH was on notice that the district court would rely on information outside of the *evidentiary record* (potentially including *ex parte* communications *with a witness*) to reject OSH's factual defense to contempt.

To the contrary, the contempt proceeding was treated as any other contested evidentiary hearing: DRO presented its case-in-chief after which OSH moved for summary dismissal based on insufficient evidence. (*See* 2-ER-147). The district court denied the motion, and OSH presented its case-in-chief. The parties then "rest[ed]" their cases, presented closing argument, and the district court took the matter "under advisement" after confirming which exhibits were "in the record." (2-ER-313; 4-ER-618).

Of course, none of this is to say that the imposition of a coercive civil fine requires the *full* range of traditional procedural protections, such as the right to a jury trial. *See Bagwell*, 512 U.S. at 832-33. But just as a jury is not permitted to go outside the evidentiary record to make a factual finding, neither is a judge. *At a minimum*, the district court was required to give OSH notice of its intent to rely on Dr. Pinals's Eleventh Report (as well as any *ex parte* communications communications) and afford OSH the right of cross-examination and an opportunity to present rebutting evidence. *See Bagwell*, 512 U.S. at 834 (holding that "due process requires the contemnor's rights to notice and a hearing be respected"). Because the district court's factual findings are not based on "*the evidence*," but rather new information and potentially an *ex parte* communication with a witness without providing advance notice to the

parties, the district court "necessarily abuse[d] its discretion" thereby requiring reversal. *See Hinkson*, 585 F.3d at 1259 (cleaned up).

The district court's unexplained decision to modify the record on appeal with a copy of the Eleventh Report does not alter that conclusion. Federal Rule of Appellate Procedure 10(e)(1) allows the district court to modify the record on appeal only when the parties dispute "whether the record truly discloses what *occurred* in the district court." (Emphasis added). The rule thus focuses on whether the record "truly discloses" what *transpired* before the district court, and courts "may not" use the rule "to supplement the record with material not introduced or with findings not made." *United States v. Garcia*, 997 F.2d 1273, 1278 (9th Cir. 1993) (citing *United States v. Walker*, 601 F.2d 1051, 1054–55 (9th Cir.1979) (affidavits not in original record disallowed); *Shew v. Brownell*, 219 F.2d 301, 302 (9th Cir.1955) (new findings correcting court's original erroneous statement of the burden of proof disallowed)); *United States v. Page*, 661 F.2d 1080, 1082 (5th Cir. 1981) (permitting supplementation of the record with a later-added minute entry describing what happened in a pretrial conference in district court).

Here, there is no dispute about what transpired: the district court went outside of the evidentiary record to hold OSH in contempt without giving OSH an opportunity to confront the new information and cross-examine Dr. Pinals

about the Eleventh Report. This Court's consideration of the Eleventh Report "would pose serious due process concerns" by repeating the very error at issue—reliance on information that was not admitted as evidence during the contempt hearing. *See United States v. Litwin*, 972 F.3d 1155, 1174 (9th Cir. 2020).

### B. The contempt order does not clearly set forth conditions by which the contempt may be purged.

The purpose of a coercive civil penalty is "to compel obedience to a court order." *United States v. Bright*, 596 F.3d 683, 695–96 (9th Cir. 2010). "Given the remedial purpose of the sanction, a finding of contempt must be accompanied by conditions by which contempt may be purged, spelled out in either the original order or the contempt order." *Id*. Here, the only condition for purging the contempt is "substantial compliance with the seven-day standard." (1-ER-36). Substantial compliance, however, is a defense that "excuses an alleged contemnor who, despite *not* achieving total compliance, has achieved near-total compliance through the exhaustion of all reasonable efforts." *See Coleman*, 131 F.4th at 956 (emphasis added). The district court thus determined that, although the basis for the contempt finding was noncompliance with the permanent injunction, something short of full compliance would purge the contempt. Yet what constitutes "substantial compliance" is unknown; the district court did not provide any indication.

To be clear, OSH has worked "diligently and in good faith" to regain compliance with the permanent injunction, and OSH was in "substantial compliance" with most of Dr. Pinals's recommendations. (2-ER-135–36; 3-ER-386–92).[11] But as both the district court and Dr. Pinals observed, numerous other stakeholders "affect [OSH's] ability to achieve and maintain [full] compliance," and some of those stakeholders are "actively opposing" (and thereby "thwarting") OSH's efforts. (1-ER-30; 2-ER-72, 90, 138–39; *see also*, e.g., 4-ER-613). And fines thus far exceed $1.9 million. (ECF 656, 690, 701). It is therefore critical that the conditions by which the contempt may be purged are clearly "spelled out" in the order. Having rejected OSH's defense that it had taken all reasonable steps to comply, the district court must clearly specify what benchmark it considers to be "near total compliance" and what further "reasonable" efforts it believes must be pursued. The district court erred by not doing so.

### C. The district court failed to provide a reasoned explanation for the imposition of serious and substantial fines.

District courts must provide an explanation and factfinding reflecting a "reasoned consideration" of the requisite criteria justifying the imposition of

[11] "[A] party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." *Taggart v. Lorenzen*, 587 U.S. 554, 562 (2019).

serious and substantial fines. *Coleman*, 131 F.4th at 964-65 (quoting *Shuffler v. Heritage Bank*, 720 F.2d 1141, 1148 (9th Cir. 1983), and vacating contempt sanctions in the absence of a reasoned explanation); *Shuffler*, 720 F.2d at 1147–48 (vacating contempt sanctions because the district court made "no written statement of the purpose or purposes underlying its imposition of a $500 daily fine" and the appellee "ha[d] not pointed to any portion of the record demonstrating that the district court imposed the fine after a reasoned consideration of these criteria"). Among the criteria a district court must consider is "the probable effectiveness of any suggested sanction in bringing about the result desired," as well as "the amount of the defendant's financial resources and the consequent seriousness of the burden to that particular defendant." *Coleman*, 131 F.4th at 965 (cleaned up); *see also Stone*, 968 F.2d at 861 (When "employing their broad equitable powers, federal courts should 'exercise the least possible power adequate to the end proposed.'"). Even a party's good faith efforts to comply, while not a bar to contempt, are relevant in determining the appropriate sanction. *Taggart*, 587 U.S. at 562.

Nothing in the record indicates that the district court undertook a "reasoned consideration" of those criteria. In fact, the district court offered no "explanation for its calculation[]" of the daily contempt fine other than to state it was persuaded by the district court's reasoning in *Trueblood v. Washington*

*State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2016 WL 3632486, at *9 (W.D. Wash. July 7, 2016), *clarified on denial of reconsideration*, 2016 WL 4384861 (W.D. Wash. Aug. 17, 2016). (1-ER-36). To be sure, *Trueblood* also involved a permanent injunction requiring hospital admissions of incompetent pretrial detainees "within seven days of the signing of a court order." 2016 WL 3632486, at *1. But that is where the factual similarities end, and nothing in the record indicates that the district court accounted for those differences, let alone engaged in a "reasoned consideration" of them.[12]

For example, in *Trueblood,* the defendants were *never* in compliance with the injunction and had a lengthy history of ignoring the federal court's orders. 2016 WL 3632486, at *1–2. The defendants also lacked a basic understanding of the aid-and-assist population's needs and had displayed "a lack of concern for [their] basic dignity"; failed to consult with the court monitor "before making multiple important decisions regarding steps to comply" with court orders; "rejected multiple recommendations from the Court Monitor and her

---

[12] Unlike this case, *Trueblood*, is a class action lawsuit. *See Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1108–13 (9th Cir. 2003) (holding that plaintiff DRO has associational standing without addressing whether plaintiff "MPD has standing to represent its own interests"). Although unclear, it appears that some of the contempt fines in *Trueblood* may have been held for the benefit of the individual "class members." *Trueblood*, 2016 WL 3632486, at *9. If so, that further undermines the district court's reliance on the calculation in *Trueblood*.

experts"; opened "alternative restoration facilities" in former jails "without remedying" known safety issues, "thereby necessitating the issuance of two temporary restraining orders regarding the use of those facilities"; made material misrepresentations to the district court about procedures employed at a treatment facility; and failed to rectify "easily-fixable problems." 2016 WL 3632486, at *1–2, 6–7, 9. The district court thus imposed fines to implement the very remedies "the state actors were *not* creating." (2-ER-143–44) (Dr. Pinals's testimony; emphasis added)).[13]

OSH, however, complied with the permanent injunction for over *16 years* before a series of circumstances beyond its control—such as the "unprecedented" COVID-19 pandemic and "a record number" of .370 orders—occurred. (*See also* 3-ER-498–99, 523 (noting "record number" of referral orders in January and March 2023); 1-ER-32 (district court finding that "actual increases" in .370 orders "have at times exceeded predictions")). *See also Oregon Advoc. Ctr.*, No. 20-35540, 2021 WL 3615536, at *2 (describing pandemic as "an unprecedented time"). Indeed, this Court found that OSH "met its burden to demonstrate that the COVID-19 pandemic made compliance" with the permanent injunction sufficiently "onerous" to justify

[13] As indicated, Dr. Pinals "served as a psychiatric expert to the court monitor in the *Trueblood* case" for "ten years." (2-ER-63).

temporarily suspending the seven-day admissions requirement. *Id*. at *1–2. And OSH regained compliance within two years of the reimposition of that requirement.

There is no dispute that OSH has worked "diligently and in good faith to implement" Dr. Pinals's "expansive" recommendations—recommendations that "cross multiple systems" and involve "numerous stakeholders." (2-ER-108, 135–36; *see also* 3-ER-386–91 (Dr. Pinals discussing OSH's substantial compliance with recommendations); 3-ER-547–86 (Project Tracker); 3-ER-462 (Dr. Pinals's June 5, 2022, report stating OSH had "expressed an urgency related to" compliance); 3-ER-511 (Dr. Pinals's July 24, 2023, report "commend[ing] the efforts of the parties, and the work of the elected and other officials" in their collaborative work)). By her own admission, some of those recommendations have shifted over time as new information becomes available, (*e.g.*, 2-ER-69–70), and the participation of "many other stakeholders" is "required to make it all work," (2-ER-90). Yet when "hiccups" have arisen, OSH has worked "diligently" and in good faith to address them. (2-ER-135–36). Nothing in the record indicates that the district court accounted for OSH's good faith efforts, or any of the other significant differences between this case and *Trueblood*, before summarily adopting that court's determination. *See also Taggart v. Lorenzen*, 587 U.S. 554, 562 (2019) ("[A] party's good faith, even

where it does not bar civil contempt, may help to determine an appropriate sanction.”).

Nor did the district court provide any “explanation or factfinding regarding the size of its fines,” “the probable effectiveness” of those fines “in bringing about the result desired,” or the financial impact those fines would have on OSH. *Coleman*, 131 F.4th at 965 (cleaned up). To be sure, the district court asserted that it had considered those factors. (1-ER-36). But the failure to provide an explanation is problematic given the absence of any evidence in the record supporting the district court’s summary assertion.

Indeed, the evidence in the record is that fines will only *undermine* compliance, not compel it. (*See* 2-ER-136, 173; *cf*. 3-ER-462 (Dr. Pinals stating that state court “contempt hearings against OSH for failure to timely admit” individuals “created significant work despite data showing they did not necessarily expedite admissions”)). Dr. Pinals *opposed* the imposition of fines because it would create inefficiencies, delay implementation of remedies, and remove funding from “other services” absent additional legislative appropriations. (2-ER-136). As Dr. Pinals observed, “money doesn’t grow from trees.” (*Id*.). The only thing “fines would achieve is costing [OSH]

money that [it] might otherwise be spending to continue to build out" community resources. (2-ER-173).[14]

The district court thus abused its discretion by imposing fines that detract from OSH's efforts and create inefficacies in an already complex system. At a minimum, this court should remand for further "factfinding and analysis" about "the probable effectiveness" of the contempt fines "in bringing about" compliance with the permanent injunction. *See Coleman*, 131 F.4th at 965.

### D. The district court abused its discretion by making OSH financially responsible for delays outside of its control.

When a court imposes civil sanctions, it does so with the goal of coercing compliance, not as a punitive measure. *See Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 516 (9th Cir. 1992) (explaining that a court imposing contempt sanctions should consider "the probable effectiveness of any suggested sanction in bringing about the result desired"). That goal is not served when, as here, the

[14] Dr. Pinals testified that, rather than coercive or punitive fines, "the most efficient way" to regain compliance is for the legislature to appropriate funds, (2-ER-136), which it did—over $150 million to increase residential treatment programs, 2025 Or. Laws Ch. 470 §§ 1–2; foster recruitment and retention of community-based behavioral healthcare providers, 2025 Or. Laws Ch. 561; address operational challenges, 2025 Or. Laws Ch. 587 § 9; and create supportive permanent housing, which helps OSH support mentally disabled individuals in the community and prevent them from cycling back into the criminal justice system, 2025 Or. Laws Ch. 630 § 1(5)(a)(C). The legislature passed the appropriations bills in late June, and the governor signed them into law in July.

district court imposes sanctions for events outside of the coerced party's control. The permanent injunction requires the state hospital to provide "full admission" "not later than seven days after the issuance of an order determining a criminal defendant to be unfit to proceed to trial[.]" (4-ER-721). Significantly, that requirement was based on specific factual findings that jails were able to provide transportation to OSH within 24 hours:

> The jails have the capacity to transport inmates to a treatment facility within 24 hours. The reason they do not transport the inmates is because defendants refuse to accept them.

(4-ER-729). That factual underpinning is consistent with current and historical practices: When a state trial court commits an aid-and-assist criminal defendant to OSH, it generally orders the applicable sheriff's office to provide the transport. Yet the district court held OSH financially accountable under the contempt order for delays caused by a county jail's *refusal* to transport despite a state trial court ordering it to do so and despite OSH offering "full admission." (1-ER-17–18).

Given the factual basis for the permanent injunction and the narrow remedy it ordered—admission upon transport by the jail—the hospital should not be financially penalized for the actions (or inactions) of a fiscally and politically distinct entity that OSH cannot control. Such fines are not narrowly

tailored to achieve compliance and are punitive in nature. The district court erred in concluding otherwise.

## II. The remedial relief ordered by the district court lacks the requisite specificity for injunctive relief.

The district court ordered OSH to undertake certain "remedial measures" that it described as "narrowly tailored, necessary, specific, and clear." (1-ER-38). Yet the remedies ordered in paragraphs 4(a)–(d) are anything but that. *See In re Soares*, 107 F.3d 969, 975 (1st Cir. 1997) ("An appellate court is not bound by a trial judge's unsupported description."). Each of those remedies require defendants to use "all reasonable steps" or "all reasonable efforts" toward a generalized goal. (1-ER-38–39). Those terms do not provide the requisite specificity for injunctive relief.

Under Rule 65 of the Federal Rules of Civil Procedure, an injunction order must "state its terms *specifically* ... [and] describe in reasonable detail ... the act or acts restrained or required." Fed. R. Civ. P. 65(d) (emphasis added); (*see also* 1-ER-20, 22 (district court relying, in part, on Rule 65 to impose remedial relief). That requirement is "designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1047 (9th Cir. 2013) (cleaned up). "[T]he specificity provisions of Rule 65(d) are no mere

technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). "The Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id*.; *see also Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 444 (1974) (explaining that "one basic principle built into Rule 65 is that those against whom an injunction is issued should receive fair and *precisely drawn* notice of what the injunction actually prohibits" (emphasis added)); *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019) (cleaned up) (citing Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2960, pp. 430–431 (3d ed. 2013), and stating that "principles of basic fairness require that those enjoined receive explicit notice of what conduct is outlawed before being held in civil contempt").

None of the remedial remedies imposed in paragraphs 4(a)–(d) of the contempt order are sufficiently specific as to be enforceable injunctive relief. *See Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) (holding that an order including requirements like "a 'systematic' program for screening and evaluation, participation of 'sufficient' numbers of mental health professionals, and implementation of a 'basic' program for identifying, treating, and supervising suicidal prisoners," was not sufficiently specific to hold a state in contempt); *see also Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia*

*Marine Trade Ass'n*, 389 U.S. 64, 74 (1967) (concluding that an order to "abide by the Arbitrator's Award" was not sufficiently clear and definite for contempt). Each consists of a requirement that OSH take "all reasonable steps" or "use all reasonable efforts" to accomplish generalized goals, such as "reduce delays" and "expedite discharges." (1-ER-38–39).

For example, under paragraph 4(a), OSH must use "all reasonable steps to impose limitations on community restoration consistent with Dr. Pinals's recommendations"—something that requires legislative action. (1-ER-38; *see* 3-ER-482 (recommending legislative changes)). The ambiguity of that provision is underscored by the fact that, at the time of the contempt hearing, a bill (proposed by OSH and the governor) to impose time limits on community and inpatient restoration was before the legislature. (*See* 2-ER-72, 166–67, 248–49). Dr. Pinals had previously opined that it was "imperative" that OSH "socialize the legislative proposals," which would include "potential presentations" and "meetings with" legislators. (3-ER-545; *see also* 2-ER-99). To the extent "all reasonable steps" requires "socialization," OSH has no way of discerning, for example, how many meetings or presentations would be

sufficient to satisfy the district court, or whether the quality of those presentations would be deemed insufficient.[15]

The legislature's passage of a modified version of OSH's proposal does not alleviate the paragraph's ambiguity problem. The modified version includes numerous exceptions to the limits imposed on community restoration—exceptions that OSH and the governor opposed and which resulted from pushback from multiple stakeholders. *See* 2025 Or. Laws Ch. 559 §§ 43–49; Governor Kotek's Signing Letter, House Bill 2005 (July 24, 2025), *available at* https://www.oregon.gov/gov/Documents/HB_2005_Signing_Letter.pdf. As the remedial measure is written, it is impossible to know whether OSH has completed the requirements in paragraph 4(a), whether the district court would view OSH's efforts as insufficient because of the legislature's independent decision to include exceptions, or whether additional and unspecified "reasonable steps" are required.

The remaining paragraphs are similar. In paragraph 4(b), the district court ordered OSH to "use all reasonable efforts to facilitate and expedite discharges of patients no longer needing a hospital level of care, including

[15] In 2023, the governor and OSH unsuccessfully sought legislation that would have imposed time limits on both inpatient and community restoration. (*See* 2-ER-71–72); Or. Senate Bill 219 (2023).

working with the local Community Mental Health Programs and the committing court to expeditiously effect discharges." (1-ER-39). The order does not specify what it would mean for OSH to "work with" local community mental health programs or the committing court, nor does it make any mention of what "reasonable efforts" the district court believes OSH has not yet taken.

Under paragraph 4(c), OSH must "use all reasonable efforts to reduce delays at every step of the GEI discharge review and the 'conditional release ready' discharge processes"—a process that is dependent on another state agency and not entirely within OSH's control. (1-ER-39; 2-ER-88–89). And under paragraph 4(d), OSH must "use all reasonable efforts to eliminate the backlog of forensic evaluations within a reasonable time to be determined by Dr. Pinals and to ensure sufficient long-term evaluator positions to maintain an ability to complete all ordered forensic evaluations in a timely manner." (1-ER-39).

The lack of specificity is a grave defect. OSH may think that one approach to a potential problem is reasonable only to discover later that the district court disagrees. OSH should not be forced to speculate about what further steps it must take under the threat of additional contempt proceedings and potential fines. Nor should it be required to guess what benchmarks it must achieve, such as how much of a "reduc[tion in] delay" is required "at every step

of the GEI discharge review" or what number of forensic evaluators will be "sufficient." *Compare Balla*, 869 F.2d at 465 (holding that requirements like "a 'systematic' program for screening and evaluation, participation of 'sufficient' numbers of mental health professionals, and implementation of a 'basic' program for identifying, treating, and supervising suicidal prisoners," was not sufficiently specific to hold a state in contempt), *with Coleman*, 131 F.4th at 954 (remedial order requiring state to reduce "vacancy rates among designated categories of mental health care providers down to fixed targets," such as ten percent, was sufficiently specific). The district court thus abused its discretion by issuing generalized and nonspecific remedial orders.

## III. The district court erroneously failed to establish parameters for the role of court monitor and to provide a mechanism for reviewing her decisions.

At a status conference in January 2025, the district court asked whether Dr. Pinals's role should be "changed to that of a court monitor." (4-ER-619).[16] Although OSH took no position on whether her role should be "elevated," it specifically requested an opportunity to address the parameters of her new role and the scope of her work "*before* a final decision [was] made." (3-ER-363–64

[16] As indicated, the district court issued an order two days before the status conference, directing OSH to present live testimony addressing a list of questions, one of which was, "Should Dr. Pinals's role of neutral expert be changed to that of a court monitor?" (4-ER-619).

(emphasis added)). The district court did not afford OSH that opportunity. Instead, without advance notice, it appointed Dr. Pinals as a court monitor and failed to impose *any* parameters on her exercise of authority. The absence of any limitation on Dr. Pinals's authority risks an improper delegation of quasi-judicial function without a mechanism for review.

Generally, there are two sources of authority for appointing private individuals to accomplish specified tasks on behalf of the court: Rule 53 of the Federal Rules of Civil Procedure and federal courts' "inherent equitable powers to fashion additional remedies." *Melendres*, 113 F.4th at 1133. Under Rule 53, special masters are quasi-judicial officers who lack the ability to "compel any action by the parties without approval by the district court." *Id*. at 1132-33 (citing Fed. R. Civ. P. 53(f)). The order of appointment must clearly specify, among other things, the master's duties, when *ex parte* communications are permitted, and the procedures for reviewing the master's orders and recommendations. Fed. R. Civ. P. 53(b)(2). The parties must be afforded an opportunity to object to "the master's order, report, or recommendations," and the district court cannot act on such an order, report, or recommendations without first "giv[ing] the parties notice and opportunity to be heard." Fed. R. Civ. P. 53(f)(1).

Although the requirements in Rule 53 do not apply when a district court exercises its equitable powers to appoint a court monitor, it does not follow that a district court may confer blanket authority or otherwise delegate judicial functions. *See Melendres*, 113 F.4th at 1134-35 (discussing prohibition on delegation of judicial responsibilities); *Armstrong v. Brown*, 768 F.3d 975, 987 n.4 (9th Cir. 2014) (holding that it is impermissible to delegate authority to a "Rule 706 expert" to resolve disputes between the parties and citing with approval *SEC v. Elliott*, 953 F.2d 1560, 1577 (11th Cir. 1992) (noting that the court-appointed receiver was an officer of the court whose legal and factual findings must be approved by the district court), and *Reilly v. United States*, 863 F.2d 149, 157–58 (1st Cir.1988) (finding no error in the district court's use of a technical advisor to instruct the judge on complex issues, but noting that the delegation would have been impermissible if the advisor made independent findings on facts outside the record)).

Here, the district court did not set *any* parameters on the monitor's exercise of authority, nor did it establish procedures for resolving disputes—an omission that is particularly glaring given OSH's express request to define the monitor's scope of work. (*See* 3-ER-364). The district court's order, in its entirety, states:

> Effective immediately, Dr. Pinals' role is changed from Neutral Expert to Court Monitor. Dr. Pinals' new role includes the

> ability to hire staff to assist her. This change is intended to further guide defendants' focus and efforts toward achieving and maintaining compliance with the Permanent Injunction. Defendants shall be responsible for the costs associated with implementing this remedial measure.

(1-ER-38). Although the district court apparently relied on its inherent equitable powers, *see Melendres*, 113 F.4th at 1133-34, it is impossible to determine whether the district court exceeded that authority by, for example, delegating quasi-judicial functions without establishing a mechanism for judicial review, *see Armstrong*, 768 F.3d at 988 (holding that the absence of "any mechanism for review of the [non-judicial officer's adjudicatory] decisions by the district court * * * risks permitting the [non-judicial officer] displace the district court's judicial role" (cleaned up)).

The risk of improper delegation is not abstract or hypothetical. In the order itself, the district court appears to have delegated at least some quasi-judicial functions insofar as compliance with the remedial measure in paragraph 4(d) is based on Dr. Pinals's determination of what constitutes "a reasonable time" for eliminating the "backlog of forensic evaluations." (1-ER-39). Thus, rather than overseeing implementation of the remedial measure, Dr. Pinals is charged with defining the remedial measure in the first instance.

As litigation has continued, the district court also has assigned Dr. Pinals the role of adjudicating whether OSH is entitled to "exclude from the

calculation of contempt fines days resulting" from circumstances beyond its control (such as a jail's refusal to transport or a circuit court's failure to transmit the .370 order). (*See* 1-ER-2–3). That is, the district court has recognized that there are some circumstances in which it will be impossible for OSH to timely admit a pretrial detainee. But the court has delegated the quasi-judicial function of determining whether that impossibility exists or whether OSH should be held in contempt to the court monitor, a nonjudicial officer. And the district court has not established any procedure for challenging the monitor's determination. (*See* 1-ER-2–3).[17]

The district court may have intended Dr. Pinals's role to be more limited, or it may have intended her decisions "to be subject to review or appeal." *See Armstrong*, 768 F.3d at 988. But neither of those intentions is "reflected in its order." *See id*.; *compare Melendres*, 113 F.4th at 1131, 1137 (order appointing court monitor specifically delineated the monitor's authority and expressly allowed for judicial review of the monitor's decisions).[18] The absence of *any*

[17] Equally problematic is the fact that there are no limitations on the number or type of "staff" Dr. Pinals can hire "to assist her," the scope and duration of the staff's assignment, or the rates those staff can charge OSH. Nor is there any mechanism for OSH to challenge those decisions.

[18] In *Melendres*, this Court declined to decide whether "the delegation in an injunction of executive authority to a judicially appointed individual requires

*Footnote continued…*

meaningful limitation on the court monitor's authority or some mechanism for review of the monitor's decisions "risks permitting the [monitor] to displace the district court's judicial role." *Armstrong*, 768 F.3d at 988 (cleaned up); *see also Melendres*, 113 F.4th at 1134 ("The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III."). This Court should accordingly vacate the appointment order. *See Armstrong*, 768 F.3d at 988 (vacating portion of injunction improperly delegating authority to neutral expert and remanding for district court to correct deficiencies).

**CONCLUSION**

This Court should reverse the contempt order, the order imposing financial responsibility on OSH for the conduct of others, and the First Judgment Regarding Contempt Fines. At a minimum, the Court should remand to the district court with instructions to make the remedial order more specific,

/ / /

/ / /

/ / /

/ / /

---

provision for judicial review" because the order at issue included such a provision. 113 F.4th at 1137.

to define Dr. Pinals's role as court monitor, and to make explicit findings regarding the efficacy of imposing contempt fines.

Respectfully submitted,

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General

/s/ Leigh A. Salmon

LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorneys for Defendants-Appellants
Sejal Hathi and Sara Walker

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Appellants' Brief is proportionately spaced, has a typeface of 14 points or more and contains 12,677 words.

DATED: January 9, 2026

/s/ Leigh A. Salmon
LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorney for Defendants-Appellants
Sejal Hathi and Sara Walker

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
LEIGH A. SALMON #054202
Senior Assistant Attorney General
1162 Court St.
Salem, Oregon 97301
Telephone: (503) 378-4402

Counsel for Appellants

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| DISABILITY RIGHTS OREGON; METROPOLITAN PUBLIC DEFENDER; A. J. MADISON,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>Doctor SEJAL HATHI, in her official capacity as Director of the Oregon Health Authority; SARA WALKER, in her official capacity as Interim Superintendent of the Oregon State Hospital,<br><br>Defendants - Appellants. | U.S.C.A. Nos. 25-3868, 25-5609 and 25-5769<br><br>STATEMENT OF RELATED CASES |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of Appeals for the Ninth Circuit, the undersigned, counsel of record for Appellants, certifies that she is aware of one related case pending before this Court: *Disability Rights Oregon, et al. v. Hathi, et al.*, Case No. 26-64. That case involves an appeal from the Amended Second Judgment Regarding

Contempt Fines, which was issued pursuant to the contempt order being challenged in this appeal.

Respectfully submitted,

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General

/s/ Leigh A. Salmon
LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorneys for Defendants-Appellants
Sejal Hathi and Sara Walker

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2026, I directed the Appellants' Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Leigh A. Salmon
LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorney for Defendants-Appellants
Sejal Hathi and Sara Walker