**No. 25-3868; No. 25-5609; No. 25-5769**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

Disability Rights Oregon., *et al.*,
*Plaintiffs-Appellees*,

v.

Sejal Hathi, *et al.*,
*Defendants-Appellants,*

On Appeal from the United States District Court
for the District of Oregon
No. 3:02-cv-00339-AN
Hon. Adrienne Nelson, District Judge

# ANSWERING BRIEF OF PLAINTIFFS-APPELLEES

EMILY COOPER
THOMAS STENSON
Disability Rights Oregon
900 S.W. 5th Avenue, Suite 1800
Portland, Oregon 97205
Tel: 503-243-2081
ecooper@droreon.org
tstenson@droregon.org
*Attorneys for Plaintiff-Appellee*
*Disability Rights Oregon* (formerly
Oregon Advocacy Center)

JESSE MERRITHEW
Levi Merrithew Horst PC
610 SW Alder Street, #415
Portland, OR 97205
Tel: 971-229-1241
jesse@lmhlegal.com
*Attorneys for Plaintiff-Appellee*
*Metropolitan Public Defender*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Disability Rights Oregon and Metropolitan Public Defender state that neither agency has a parent corporation and that no publicly-held companies hold 10% or more of their stock.

Date: March 11, 2026

/s/ Thomas Stenson
Emily Cooper
Thomas Stenson
Disability Rights Oregon
510 S.W. 10th Avenue, Suite 200
Portland, Oregon 97205
Tel: 503-243-2081
tstenson@droregon.org

*Attorney for Plaintiff-Appellee*
*Disability Rights Oregon*

## TABLE OF CONTENTS


Corporate Disclosure Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

**I. Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**II. Statement of the Issues** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**III. Statement of the Case** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**A. Procedural and Factual History** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**IV. Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**V. Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**A. Oregon Has Waived Most of Its Claims by Failing to Raise Them in the District Court.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

1. The legal standard on raising issues for appeal results in waiver of all but two of Oregon's claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

2. Oregon failed to raise the due process claim with the District Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

3. Oregon also failed to raise its concerns about the Court Monitor, the amount of the fines, and other claims raised first on appeal. . . . . . . 11

4. Oregon did raise its claims regarding the specificity of the remedial order in defining "all reasonable steps" and the order's denial of certain fine exemptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**B. The District Court Did Not Abuse Its Discretion in Resolving the Two Matters Properly on Appeal** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1. The district court properly articulated its rationale for refusing to exempt the state from fines allegedly attributed to third parties. . . . 14

2. The district court did not err by using the terms "all reasonable steps" and similar language in its remedial order. . . . . . . . . . . . . . . . . . . . . 17

**C. The District Court Did Not Violate Due Process in Considering Dr. Pinals' Eleventh Report** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

1. Oregon had ample notice of the contempt proceeding and the likely use of the Eleventh Report based on prior stipulation and past practice of the parties reliance on an expert tasked with assessing compliance efforts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

2. Oregon was given an ample opportunity to be heard and to present evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**D. Even Ignoring the Eleventh Report, the Contempt Order Should Be Affirmed as the District Court Could and Did Rely on Hearing Testimony, Not the Eleventh Report, in Rejecting State's Defense.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**E. Oregon Failed to Meet Its Legal Burden and Demonstrate a "Substantial Compliance" Defense at the Contempt Hearings, With or Without the Eleventh Report.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1. In January 2025, Oregon had failed to achieve compliance with the Permanent Injunction, with admission delays of almost a month. . . 30

2. Oregon did not take all reasonable steps as documented by the lack of sufficient beds, funds, and staff as well as failure to take all steps recommended by the Court Monitor to improve compliance. . . . . . 31

**F. The Legal Term "Substantial Compliance" Does Not Render the Remedial Order Vague.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**G. The Court Reasonably Articulated Its Basis in Establishing Fine Amounts.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**H. The District Court Did Not Unconstitutionally Delegate Judicial Authority to the Court Monitor.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

1. The Contempt Order Does Not Vest the Court Monitor with any Judicial Function. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**VI. Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

## TABLE OF AUTHORITIES

Federal Case Law

*Armstrong v. Brown*, 768 F.3d 975 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . 41

*Coleman v. Newsom*, 131 F.4th 948 (9th Cir. 2025) . . . . . . . . . . . . . . . . . . . . *passim*

*E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 8

*Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162 (9th Cir. 2025) . . . . . . . . 20, 22, 25

*Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075 (9th Cir. 2004) . . . . . . 18

*F.T.C. v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) . . . . . . . . . . . . . . . 29, 30

*F.T.C. v. Am. Nat. Cellular*, 868 F.2d 315 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . 27

*Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56 (1982) . . . . . . . . . . . . . . . 9

*Hilao v. Est. of Marcos*, 103 F.3d 762 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 7

*Hook v. Arizona Dep't of Corr.*, 107 F.3d 1397 (9th Cir. 1997) *as amended* (Apr. 22, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693 (9th Cir. 1993 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) . . . . . 10

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . 17, 36

*Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116 (9th Cir. 2008) . . . . . . 27

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) . . . . . . . . . . . . . . . . . . 19

*Melendres v. Skinner*, 113 F.4th 1126 (9th Cir. 2024) . . . . . . . . . . . . . . . 8, 17, 41, 42

*Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369 (Fed. Cir. 2024) . . . . . . . 9

*Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003) . . . . . . . . . . . 15, 16, 31

*Parsons v. Ryan*, 949 F.3d 443 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . 15, 39, 40

*Peterson v. Highland Music, Inc.*, 140 F.3d 1313 (9th Cir. 1998) . . . . . . . . . 25, 28

*Rainbow Pioneer No. 44-18-04A v. Hawaii-Nevada Inv. Corp.*, 711 F.2d 902 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302 (7th Cir. 2010) . . . . . 9

*Stone v. City & Cnty. of San Francisco*, 968 F.2d 850 (9th Cir. 1992), *as amended* (Aug. 25, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 32, 34

*Taggart v. Lorenzen*, 587 U.S. 554 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Thomas v. Chicago Park Dist.*, 227 F.3d 921 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 37

*Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 25

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2016 WL 3632486 (W.D. Wash. July 7, 2016), *clarified on denial of reconsideration*, No. C14-1178-MJP, 2016 WL 4384861 (W.D. Wash. Aug. 17, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

*Turnacliff v. Westly*, 546 F.3d 1113 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Ayres*, 166 F.3d 991 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Bright*, 596 F.3d 683 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Lopez-Perera*, 438 F.3d 932 (9th Cir. 2006) . . . . . . . . . . . . . 17, 37

*United States v. Weinberg*, 439 F.2d 743 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . 21

*Vasquez v. Rackauckas*, 734 F.3d 1025 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . 8

*Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*, 689 F.2d 885 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510 (9th Cir. 1992) . . . . 8, 10, 15, 39

<u>State Statute</u>

ORS 426.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# I. INTRODUCTION

In 2002, Oregon jail detainees with serious mental illnesses found unable to stand trial because of mental illness sat in jail cells for weeks or months on end. Oregon's mental health authorities failed to ensure the prompt placement of jail detainees consistent with the Fourteenth Amendment. After trial on this issue, the district court issued a permanent injunction requiring the prompt admission of detainees within seven days of the issuance of an order finding them unable to stand trial because of their psychiatric crisis.

While Oregon remained in compliance with this injunction for many years, it ceased complying with the order in fall 2018 and has largely been out of compliance since. In the five years between March 2020 and March 2025, the state was out of compliance about 90% of the time. The district court made repeated efforts, giving Oregon authorities chance after chance to come into compliance, crafting remedial order after remedial order to encourage and facilitate Oregon's compliance with the permanent injunction. The court appointed a neutral expert by stipulation of the parties in 2021 to assist in compliance efforts and to monitor the state's efforts.

At a hearing in November 2024, Oregon admitted that they were out of compliance and that they had no timeline for regaining compliance. Plaintiff

Disability Rights Oregon ("DRO") filed a motion to hold the state in contempt. The court held hearings on three days in January 2025 and March 2025 to allow the state to prove any defense to contempt. Evidence at the hearing showed that the state's level of effort had waxed and waned, and that many of the reasonable steps pointed to by the state had only been initiated weeks before the hearing, while other portions of the state's case indicated merely future planned actions.

After almost seven years of noncompliance, the district court issued an order in June 2025 holding the state in contempt and imposing fines of $500 per detainee per day spent in jail beyond the seven-day limit of the permanent injunction. The court found that, while the state showed some efforts towards compliance, the state had failed to show that it had taken "all reasonable steps" towards compliance. The court relied on the evidence and exhibits introduced at the hearing and in briefing, as well as the Eleventh Report of the neutral expert, appointed by consent of Oregon, in its opinion. The court required the state to come into compliance with the permanent injunction and appointed the neutral expert as the court monitor. These steps were the result of a reasoned and considered process from the court and a multi-day evidentiary hearing after years of opportunity to reach compliance.

This Court can resolve the appeal with ease. Of all the issues raised by Oregon in its appeal, only two were raised before the district court: 1) whether the remedial order was sufficiently specific and 2) whether the district court properly

denied certain contempt fines exemptions. This Court need not address those issues not raised below. The only matters properly on appeal are easily resolved. First, the district court did not create a vague standard in directing Oregon to take "all reasonable steps" to come into compliance. That term is a well-understood legal term of art. Second, the district court gave a cogent opinion in declining to exempt certain cases from the contempt fines. Under Ninth Circuit law, any decision articulating a reasoned basis for decisions regarding the conditions or amounts of contempt fines will not be overturned.

Should this Court reach the remaining issues raised in the appeal, it can readily find the district court committed no error. Oregon was not deprived of due process, as it had ample notice of the proceedings and had three days to present evidence and argument for an opportunity to be heard. Oregon also was given ample notice of the Eleventh Report, produced pursuant to stipulation between the parties. Oregon continued to violate the constitutional rights of pretrial detainees and yet had not come into substantial compliance as of the March 2025 hearing, with detainees with acute mental health symptoms waiting in jail almost a month for a hospital bed. The state had taken some reasonable steps but had ultimately failed to address the core lack of resources. The district court did not create vague standards by using common legal phrases in its directives. In setting the conditions and amounts of fines, the district court engaged in the required "reasoned

consideration" which should be afforded deference on appeal. The challenged orders did not vest the Court Monitor with any judicial authority.

## II. STATEMENT OF THE ISSUES

1. Did Oregon raise before the district court all of the issues cited in their opening brief and allow the district court to address their concerns?
2. Were Oregon's due process rights in the civil contempt proceeding violated by the consideration of the Neutral Expert's Eleventh Report?
3. If Oregon's due process rights were violated by consideration of the Eleventh Report, was any such error harmless or can the contempt order be affirmed based on other evidence in the record?
4. Did the Court's order lack clarity as to its remedial steps or the means of purging contempt, requiring remand?
5. Did the Court abuse its discretion in determining the amount or circumstances for the imposition of fines?
6. Did the Court, in the orders under review, unconstitutionally delegate judicial functions to the court monitor, a nonjudicial officer?

## III. STATEMENT OF THE CASE

### A. <u>Procedural and Factual History</u>

In 2002, following a trial, the district court found that the state of Oregon was violating the constitutional rights of detainees unable to stand trial because of

their mental illness. Oregon's mental health authorities left those detainees to sit in jail cells for weeks and months, neglecting to transport them for psychiatric care and restoration. The district court issued a permanent injunction requiring the state authorities to transport detainees to the state psychiatric hospital within seven days of the issuance of an order finding them incompetent to stand trial.

Oregon maintained general compliance with this order through 2018, when detainees again waited weeks and months in jail for transport to the hospital. 1-ER-25. As the district court found: "With little exception, defendants have been persistently out of compliance with the Court's Permanent Injunction since 2018." 1-ER-29. The only times of compliance were between September 2019 and February 2020 and for "six to seven months" in late 2023 and early 2024. 2-ER-101; 3-ER-523 (graph showing intermittent compliance between August 2023 and May 2024). In the 60 months between March 2020 and March 2025, Oregon was out of compliance about 90% of the time. The district court made extensive efforts to craft remedial orders over many years. The district court appointed a neutral expert at the request of the parties in December 2021, to assist in this remedial process. While some efforts under the guidance of the neutral expert reduced the waiting time and even restored compliance for several months in 2024, detainees continued to linger in jail cells. At a November 2024 status hearing, Oregon informed the district court that could not "think of anything else . . . to move us

forward in compliance," but had no "projections" for when it would come into compliance. 3-ER-432; 3-ER-419.

In January 2025, the delays for detainees stretched to almost a month. DRO filed a motion seeking contempt of court sanctions and remedial orders. Plaintiff Metropolitan Public Defender ("MPD") filed a motion seeking further remedial orders. The Court heard evidence from Oregon in late January and set a two-day hearing for the contempt sanctions and related motions. The parties appeared in March 2025 and presented evidence and argument. Oregon agreed that it was in violation of the permanent injunction but argued that it should not be held in contempt. In June, the district court issued an order holding Defendants in contempt, granting some of the requested remedial orders, and appointing the neutral expert as a court monitor. The district court relied in part on the neutral expert's Eleventh Report, which had been published in May 2025. SER-20. Defendants sought a stay of the order and certain relief from some fines, which the court also denied. Defendants' timely appeals from the contempt order, the denial of the stay, and the first judgment imposing contempt fines followed and were consolidated in this appeal.

## IV. STANDARD OF REVIEW

This matter pertains to the determination of contempt and imposition of contempt fines by the District Court. "A district court's civil contempt order is

reviewed for an abuse of discretion." *Hilao v. Est. of Marcos*, 103 F.3d 762, 764 (9th Cir. 1996). In assessing whether a contemnor was allowed due process in a civil contempt proceeding, the appellate court provides *de novo* review. *Coleman v. Newsom*, 131 F.4th 948, 956 (9th Cir. 2025). An appellate court will not disturb the fact-finding of the trial court except on showing of clear error. *Id.*

## V. ARGUMENT

### A. Oregon Has Waived Most of Its Claims by Failing to Raise Them in the District Court

Prior to its notice of appeal, Oregon never objected to consideration of the Eleventh Report, never requested a hearing on the Eleventh Report, never submitted contrary evidence to rebut the Eleventh Report, and never submitted a motion to reconsider to the district court. Oregon did not object to the means of calculation of the fines, the means of abating contempt, or the scope of the court monitor's authority before the trial court. It filed no motion to reconsider or motion to clarify any aspect of the contempt order. With the exception of its objection to the alleged vagueness of the remedial order and the denial of certain fine exemptions, Oregon presented none of its claims on appeal to the district court for decision.

1. <u>The legal standard on raising issues for appeal results in waiver of all but two of Oregon's claims.</u>

Ordinarily, an appellate court will not review an issue "raised for the first time on appeal." *Turnacliff v. Westly*, 546 F.3d 1113, 1120 (9th Cir. 2008); *E.E.O.C.*

*v. Farmer Bros. Co*., 31 F.3d 891, 901 (9th Cir. 1994). An "argument must be raised sufficiently for the trial court to rule on it." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992). A motion for reconsideration can be an appropriate vehicle to raise an issue to enable appellate review. *Id.* Similarly, a motion to clarify may be an appropriate vehicle to address the language of a remedial order. *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 954 (9th Cir. 2014) ("Though they had every opportunity, the Defendants did not seek clarification of their obligations."). An issue not raised below may typically only be reviewed to avoid injustice, where the law has changed in the interim, or where the question is one of pure law. *Turnacliff*, 546 F.3d at 1120.

This well-established requirement to raise the issues at the trial court level applies to contempt proceedings and the scope of injunctive relief, just as to other matters. *Melendres v. Skinner*, 113 F.4th 1126, 1134 n.11 (9th Cir. 2024) (court would review appeal of scope of court monitor's role only because litigant had "objected to the Monitor's complaint-handling authority" in other filings before the district court); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 858 (9th Cir. 1992), *as amended on denial of reh'g* (Aug. 25, 1992) (city waived objections to master's report by not raising them); *Vasquez v. Rackauckas*, 734 F.3d 1025, 1054 (9th Cir. 2013) (refusing to entertain allegation that "district court injunction does not 'describe in reasonable detail . . . the act or acts restrained or required'"

because it was raised only on appeal); *Rainbow Pioneer No. 44-18-04A v. Hawaii-Nevada Inv. Corp*., 711 F.2d 902, 905 (9th Cir. 1983) (objection to scope of receivership order waived by failure to present it to district court below). The Ninth Circuit is an appellate court, not a court of first instance. Oregon must give the trial court the opportunity to address its objections. Oregon may not bypass the district court and try complex, factually intricate questions in the circuit court on a matter the district court has been administering for years.

While the state did file a motion to stay after their notice of appeal that raised its due process claim, the notice of appeal divested the district court of authority over the findings that the state had just appealed. *Griggs v. Provident Consumer Disc. Co*., 459 U.S. 56, 58 (1982). An argument raised for the first time in a motion to stay pending appeal is thus waived. *Natera, Inc. v. NeoGenomics Labs., Inc.*, 106 F.4th 1369, 1375 (Fed. Cir. 2024); *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 308 (7th Cir. 2010). Oregon cannot deprive a district court of authority to act through a notice of appeal, then raise an issue for the first time once the district court is powerless to address it.

2. <u>Oregon failed to raise the due process claim with the District Court.</u>

Oregon has waived its due process claims but it failed to properly raise them with the District Court. The need to raise the due process issue before the trial court was particularly acute, because one of the trial court's potential responses to

a timely objection or motion could have been to grant the state the hearing or potentially the relief a party seeks in order to cure any supposed problem. "This principle accords to the district court the opportunity to reconsider its rulings and correct its errors." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010). Since Oregon failed to make any motion or objection, the appellate court can only attempt to construct 1) whether such a hearing would have been granted if requested, 2) what evidence the state would have produced at such a hearing, and 3) what effect any further evidence would have had on the district court and its decision.

Oregon could also have objected or responded contemporaneously to the Eleventh Report at the time of its May 2025 release, as its likely usage in any contempt finding was foreseeable. 1-ER-11 (finding the Eleventh Report was emailed to the parties in early May 2025); 1-ER-14 (finding Defendants "knew the Eleventh Report had already been provided to the Court, and at no point objected to or asked to be heard by the Court regarding the Eleventh Report's potential use by the Court in ruling on contempt"). Oregon could have filed a motion to reconsider the district court's contempt order in June, raising any other allegedly unexpected outcomes from the order. *Whittaker Corp.*, 953 F.2d at 515 (motion to reconsider was adequate vehicle to allow court to address litigant's concerns and

permit appeal). The state declined to take any of these steps, depriving the district court of any means to rule on Oregon's concerns.

3. Oregon also failed to raise its concerns about the Court Monitor, the amount of the fines, and other claims raised first on appeal.

Oregon failed to raise most remaining issues on appeal. With regard to the role of the court monitor, Oregon does note that it requested "an opportunity to address the parameters of her new role and the scope of her work 'before a final decision [was] made.'" Dkt. 24.1, at 52 (citing 2-ER-363–64). Oregon made that request at a status conference on January 24, 2025. 2-ER-320. Oregon did not elaborate at that January hearing as to what its position, expectations or requests were regarding what Dr. Pinals' role could or should be. Thus, Oregon *did have* the opportunity it requested to make argument on the scope of Dr. Pinals' authority as court monitor, on the amount and circumstances of the fines, and on the scope of the remedial relief. That opportunity was at the evidentiary hearing on March 12, 2025 and in oral argument on March 13, 2025.

On March 13th, all parties made lengthy oral argument, including Oregon. 2-ER-280–93. The district court imposed no limits on the subject matter of that oral argument. Oregon made the decision to narrow its focus to discuss only two issues: whether to hold it in contempt and whether a remedial order was necessary. 2-ER-280 (Oregon's attorney identifying "two separate questions before the Court in this hearing"). Oregon had an opportunity to raise the claims now before this

Court; namely, how Dr. Pinals might function as Court Monitor or how to further defining how contempt might be purged. Oregon chose not to make any such arguments and thus cannot appeal those claims. Even when the district court directly invited the state to weigh in on how fines might work in practice if imposed, the state advocated only against the imposition of *any* fines at all, saying imposition of fines would "take away from the State's ability to follow" Dr. Pinals' recommendations. 2-ER-287. Oregon never attempted to articulate what amount of fines might be reasonable nor how they should be calculated, if the district court were to rule against them. Where the State explicitly refused to engage the district court as to how fines ought to be calculated or assessed, what Dr. Pinals' role might be, or how contempt might be purged, it failed to raise the issues sufficiently in order to appeal those decisions later.

The district court had no way of knowing that Oregon believed that its request in January 2025 to be heard on the issue of the scope of the court monitor's authority was not answered by the opportunity to present evidence and argument in March 2025. For the first time, in the appellate court, Oregon represents that its January 2025 request meant that it wished to hold a *fourth* hearing date only if and when the district court decided to hold it in contempt. Dkt. 24.1, at 59–60. Oregon asserts without citation that it was entitled to "advance notice" of the district court's decision on contempt before it would even speak to the question of Dr.

Pinals' role (or, presumably, the nature and scope of any fines and other elements of any remedial order). Dkt. 24.1, at 43. The district court, hearing the broad request to "be heard" on the scope of Dr. Pinals' appointment in January likely reasonably believed that the March hearing was that opportunity. Oregon now alleges it failed to present these issues to the district court because it chose to wait to present its positions on important topics, not at argument on March 13, but until some fourth hearing date that it had not clearly requested, had not been promised, and that it had no reason or right to expect. Oregon's decision to wait to raise issues may have been its error, but not the district court's error.

4. Oregon did raise its claims regarding the specificity of the remedial order in defining "all reasonable steps" and the order's denial of certain fine exemptions.

Oregon adequately raised and appealed only two issues. It adequately raised on March 13, 2025, the claim that a remedial order requiring Oregon to "take all reasonable steps regarding community restoration is simply too vague." 2-ER-289; Dkt. 24.1, 54–59 (appeal on this issue). At argument, following the March 2025 hearing, counsel for the state did enunciate this particular concern with specificity as to any remedial order including that phrase.

Oregon also articulated its claims of error regarding the denial of certain fine exemptions. Dkt. 24.1, at 52-54. Although Oregon failed to raise the issue in the March 2025 contempt proceedings, Oregon properly raised the issue of the alleged

need for fine exemptions in briefing after the contempt order. The district court ruled on that issue in its later opinion. 1-ER-17–18. Oregon properly filed a notice of appeal from that ruling. Oregon's capacity to raise that issue through motion practice *after* the primary contempt order was entered illustrates, however, that the other issues improperly raised before this Court could have been successfully raised and adjudicated before the district court by collateral motion practice after the June 2025 contempt order.

## B. The District Court Did Not Abuse Its Discretion in Resolving the Two Matters Properly on Appeal

As stated above, Oregon only raised two of the issues in its appeal before the district court: 1) the request for fine exemptions for delays Oregon attributed to county sheriffs' failure to transport patients and 2) the alleged vagueness of the use of the phrase "all reasonable steps" and similar terms in the remedial orders. As those issues were the only ones properly raised before the district court and decided by the district court, the appellate court need only address those issues before resolving this appeal.

### 1. The district court properly articulated its rationale for refusing to exempt the state from fines allegedly attributed to third parties.

A district court has extremely broad latitude to set the amounts or conditions for fines, once a contemnor is determined to be in contempt of court. A district court can set terms and conditions for fines, erring only where it provides "no

written statement of the purpose" of the fines." *Parsons v. Ryan*, 949 F.3d 443, 457 (9th Cir. 2020). That written statement must only demonstrate that the court "considered the harm threatened and the effectiveness of prior injunctive relief." *Whittaker Corp*., 953 F.2d at 516; *Parsons*, 949 F.3d at 457 (requiring only "reasoned consideration to the probable effectiveness of any suggested sanction in bringing about the result desired" in setting fine amounts and conditions). The court's opinions demonstrate that it, in fact, gave such consideration to those questions, in addressing both the amount of the fines and the conditions for their imposition. 1-ER-17–18; 1-ER-36.

The district court held Oregon should not avoid fines in situations where the transport is allegedly delayed in part by omissions of court staff in delaying the communication of court orders or county sheriffs in delaying transportation. 1-ER-17–18. In doing so, the district court reaffirmed a prior holding of this court. *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1122 n.13 (9th Cir. 2003). 23 years ago, Oregon appealed the original judgment and permanent injunction to this court. Oregon alleged in part that the district court abused its discretion by denying their motion to amend the judgment. *Id.* 23 years ago, Oregon asked that "the seven-day period would begin to run from the date OSH *receives* a commitment order rather than the date the order is issued," precisely for the same reasons complained of now—that court staff might delay sending the orders to the state mental health

authorities. *Id.* This Court rejected that argument 23 years ago, saying: "The interest of an incapacitated criminal defendant in obtaining timely treatment accrues at the moment that defendant is declared unfit, not at the moment the fact of unfitness is communicated to OSH." *Id.* The Court of Appeals' holding in *Mink* is the law of the circuit and the law of the case. A district court does not abuse its discretion by following such direct authority.

The district court's opinion demonstrates that it, in fact, gave such consideration to the questions of "the harm threatened and the effectiveness of prior injunctive relief." 1-ER-17–18. The court specifically held that, based on the record provided by Oregon, it was "not convinced" that the state had actually taken all reasonable steps to abate the delays in question, a fact determination that may not be overturned except on clear error. 1-ER-18. Oregon cites again to its own declarations on this point, as if its own construction of the facts supersedes the district court's. Dkt. 24-1, at 34.[1] Oregon's proposal that all fine amounts and terms

---

[1] The e-mails between OSH staff and county sheriffs supporting Defendants' brief on this issue showed little urgency for transport, even *inviting* security staff to delay transport. In a typical exchange, the OSH security staff wrote: "When can you transport [redacted] to OSH? We could take him Monday, but I'm guessing Tuesday would work best for your transport scheduled and because you're already going to be coming Tuesday to pick up [redacted]." SER-17. In that case, the permanent injunction required transport on Monday to avoid violation of the court order. Inferring from this laconic inquiry that Oregon could do more to ensure timely transportation was reasonable.

must be "narrowly tailored" has no citation or authority. Dkt. 24.1, at 53–54. The district court did not abuse its discretion making reasonable fact findings, by following direct precedent, and determining fine conditions after the required "reasoned consideration."

2. <u>The district court did not err by using the terms "all reasonable steps" and similar language in its remedial order.</u>

Oregon's brief raises concerns about the use of the term "all reasonable steps" in the district court's directives. Dkt. 24.1, at 54–59 (objecting to use of "all reasonable steps" and "all reasonable efforts" in injunctive relief). Courts use these terms in injunctions routinely. *See, e.g., Jeff D. v. Otter*, 643 F.3d 278, 280 (9th Cir. 2011) ("The court ordered the Defendants to take all steps necessary to bring themselves into substantial compliance."). Courts do not abuse their discretion in using legal terms of art, nor are such defined terms vague. *United States v. Lopez-Perera*, 438 F.3d 932, 935 (9th Cir. 2006) (term "enter" was understood because it was a "specific legal term" in the context of immigration law); *Thomas v. Chicago Park Dist.*, 227 F.3d 921, 925 (7th Cir. 2000), *aff'd*, 534 U.S. 316 (2002) (finding word "material" was an "elemental legal term[]" and claim it was vague was "frivolous"). Courts have broad latitude in articulating injunctive relief. *Melendres*, 113 F.4th at 1139 (order broadly entrusting court monitor with "backlog-reduction-

related decisions to effectuate compliance with" injunction was sufficiently specific).

The term "all reasonable steps" does not create confusion about what the state is obliged to do. What the state must do is admit detainees in seven days of an order finding the detainee unable to stand trial. That has been the explicit requirement of the permanent injunction since 2002. As long as the underlying injunction makes it clear the act or acts "sought to be restrained," the district court need not "elucidate *how* to enforce the injunction." *Fortyune v. American Multi-Cinema, Inc*., 364 F.3d 1075, 1087 (9th Cir. 2004) (emphasis in original) (general order to "modify" theater's "policies" to facilitate timely admission of wheelchair users sufficient). Oregon wants clarification, not on the nature of what is prohibited, but on how close they have to get to compliance with the permanent injunction to escape fines. This the court need not do.

Oregon objects to multiple uses of the phrases "all reasonable steps" or its presumable synonym "all reasonable efforts" in four places in the remedial order. Dkt. 24.1, 54-59; 1-ER-38-39. The phrase "all reasonable steps" is not vague, but well-defined in the law. Oregon is *already obligated* to take "all reasonable steps" to come into compliance with the 2002 permanent injunction in this case. *Coleman,* 131 F.4th at 956; *Kelly v. Wengler*, 822 F.3d 1085, 1096 (9th Cir. 2016). The four aims identified—increasing efficiency in discharge of certain patients,

hiring evaluators, limiting community restoration timelines, and discharging patients no longer requiring hospital care—are all in service of the ultimate purpose of compliance with the permanent injunction. If the term "reasonable steps" is too vague to be understood, then so is Ninth Circuit law on contempt generally. "Decrees of that generality are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

If the state remains out of compliance with the permanent injunction, continued contempt sanctions or further penalties will depend on whether it has taken "all reasonable steps" to comply with the permanent injunction—by virtue of long-standing Ninth Circuit law, not just because of the June 2025 contempt order. Even if the challenged portions of the June 2025 order were struck out, Ninth Circuit law would continue to require the state to take "all reasonable steps" to come into compliance with the permanent injunction. The district court did not err in framing its injunctive relief. Oregon should aim at admitting all detainees unable to stand trial within seven days.

### C. The District Court Did Not Violate Due Process in Considering the Court Monitor's Eleventh Report

Having disposed of the only two issues properly raised and decided below, this court need not proceed further to consider any of the other issues in this case. If it chooses to do so, however, the issues not raised below similarly lack merit.

Oregon's brief focuses on its claim that the district court denied the state due process in the contempt proceeding by considering the Eleventh Report of the Court Monitor. Defendants had ample notice of the contempt proceedings and ample opportunity to be heard.

Dr. Pinals, the stipulated neutral expert and current Court Monitor, issued a report in May 2025, the eleventh in a series of quarterly reports. 1-ER-31–33. The district court cited this report in rendering its contempt decision. Oregon made no effort to object to consideration of the Eleventh Report and thus failed to raise any due process claim for appeal. In any event, citation to the report did not violate the due process rights of the state authorities.

The crux of the procedural due process right is two-fold: a person must have notice and an opportunity to be heard. "Civil contempt sanctions 'are . . . avoidable through obedience, and thus may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard.'" *Epic Games, Inc. v. Apple Inc.*, 161 F.4th 1162, 1186 (9th Cir. 2025). Here, Oregon had notice that the district court would likely rely on the Eleventh Report, as Oregon had stipulated to the direct provision of these reports to the court and Oregon had observed the court accept ten prior reports from the neutral expert. Oregon also had ample opportunity to be heard on contempt, with three days of testimony and argument on January 24, March 12,

and March 13 taken on the contempt issue, including cross-examination of Dr. Pinals by Oregon's attorneys on March 12. 2-ER-134–42.

1. <u>Oregon had ample notice of the contempt proceeding and the likely use of the Eleventh Report based on prior stipulation and past practice of the parties reliance on an expert tasked with assessing compliance efforts.</u>

Notice is the first of the two essential components of due process. A party facing civil contempt has the right to notice of the contempt proceedings and the nature of the order facing the contemnor. "[P]rinciples of "basic fairness requir[e] that those enjoined receive explicit notice" of "'what conduct is outlawed' before being held in civil contempt." *Taggart v. Lorenzen*, 587 U.S. 554, 561 (2019). Oregon knew that it was subject to the permanent injunction and that it had "explicit notice" of the requirements to admit patients within seven days of an order finding a detainee unable to stand trial. 3-ER-488 ("The parties are all in agreement that compliance with the seven-day standard is the ultimate goal set forth by the Court."). Oregon also had more than ample notice that it faced contempt proceedings. *Thomas, Head & Greisen Emps. Tr. v. Buster*, 95 F.3d 1449, 1458 (9th Cir. 1996) (due process satisfied where contemnor had "ample notice and an opportunity to respond to the possibility that the court would find them in contempt"); *United States v. Weinberg*, 439 F.2d 743, 746 (9th Cir. 1971) (notice that failure to testify would be subject to civil contempt and the issues likely to be included sufficed for due process notice, even if there was "practically no advance

notice" of the contempt hearing). Oregon requested March 2025 dates for a "contempt hearing," demonstrating clear understanding of the court's intent. 3-ER-401. Oregon prepared for and presented numerous witnesses at that hearing. Case law on civil contempt does not establish a greater notice requirement than notice of what orders one is accused of violating and of the opportunity to respond.

Oregon does not deny that it had notice of the content of the permanent injunction or notice of the contempt proceedings. Oregon does not deny that it knew of the Eleventh Report: the district court noted Oregon posted it on their website. 1-ER-30. Oregon asserts instead that it had some due process right to have the court give it specific "notice of its intent to rely on Dr. Pinals's Eleventh Report," without citing a single case, statute, or rule describing such a due process right. Dkt. 24.1, at 42.[2] Contempt orders have been upheld against due process challenges where, for instance, a contemnor received no more than a request for briefing on a motion to show cause as notice. *Thomas*, 95 F.3d at 1458; *see also Epic Games, Inc.*, 161 F.4th at 1190 (filed pleadings served on contemnor suffice to establish due process required for civil contempt). Oregon's proposition that due

[2] In making this claim, Oregon gratuitously describes the Eleventh Report as full of "hearsay, irrelevant information, and unchallenged opinion." Dkt. 24.1, at 42. Oregon does not specify which elements of the report are hearsay or irrelevant and did not raise either hearsay or irrelevancy as one of its claims advanced in this appeal.

process requires the district court to alert it to every single document the Court may consider from the neural expert has no legal basis.

Oregon should not have been surprised at the consideration of the Eleventh Report. Oregon had stipulated years ago to an agreement that the Neutral Expert's quarterly reports would assess their "compliance status" and be provided routinely directly to the court, defeating any supposed lack of notice. SER-82 (requesting order that Dr. Pinals should "provide brief quarterly reports <u>to update the Court regarding compliance status</u> and any needed additional recommendations to address any barriers to achieving compliance") (emphasis added); SER-78. Oregon agrees that it received a copy of the Eleventh Report. Oregon can hardly complain of surprise or "*ex parte* communications" when it had specifically stipulated to Dr. Pinals providing direct reports to the court to update the court on Oregon's "compliance status." SER-82; Dkt. 24.1, at 42. Oregon's compliance status was the focus of the contempt proceeding. The district court did not need to give any notice to use a report explicitly intended for assessing Oregon's compliance in a contempt proceeding examining that exact question.

Oregon also could not be surprised by the longstanding practice regarding Dr. Pinals' reports. The Eleventh Report was preceded, as the name suggests, by ten other reports from Dr. Pinals, also submitted directly to the court. SER-5 (submission by email directly to court was "consistent with [Dr. Pinals'] practice

with past reports”).[3] The district court routinely relied on those prior reports, incorporating them in its orders. *See, e.g.*, 4-ER-628 (ordering that the parties shall “shall implement the recommendations in the Court’s Neutral Expert’s Reports”). The relevance of Dr. Pinals’ quarterly reports was particularly obvious to these contempt proceedings, as Defendants introduced three of them as exhibits in the March 2025 hearing. 3-ER-455; 3-ER-490; 3-ER-512. Oregon’s proposal that it was entitled to specific notice of the obvious likelihood of reliance on the Eleventh Report—obvious because Oregon had stipulated to the use of these reports to assess its compliance, because it had stipulated to the direct provision of these reports to the court by the expert, because ten prior reports had been cited and used by the court previously, and because Oregon used three of the neutral expert’s reports as evidence at the contempt hearing—fails to state a denial of the due process notice requirement.

2. Oregon was given an ample opportunity to be heard and to present evidence.

The second component of due process—an opportunity to be heard—was not denied to Oregon. Oregon had the opportunity to present evidence on January

[3] Oregon’s brief erroneously claims that the district court failed to explain its decision that the Eleventh Report was part of the record below. Dkt. 24.1, at 44 (criticizing district court’s “unexplained decision to modify the record”); Dkt. 24.1, at 31 n.7 (claiming district court “entered a minute order” granting DRO’s Appellate Rule 10 motion with “no explanation”). Instead, the district court offered a six-page explanation of its decision. SER-3.

25 and March 12, then had the opportunity to present argument on March 13. This gave Oregon *three different hearing dates to be heard*. That far exceeded the minimal level of due process required for civil contempt proceedings. Due process does not require the district court to hold a fourth hearing date that Oregon never requested.

Although due process does require some opportunity to be heard, civil contempt does not even require *one* "full-blown evidentiary hearing," much less *three* to comply with due process. *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999) ("[F]inding a party in civil contempt without a full-blown evidentiary hearing does not deny due process of law to a contemnor."). Where a party fails to request a hearing, a court does not violate due process by failing to schedule one. *Thomas*, 95 F.3d at 1458 (court did not violate due process where it "did not set an evidentiary hearing on the contempt issue" and contemnors did not request one); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1324 (9th Cir. 1998), *as amended* (June 15, 1998) (failure to hold "full-blown hearing" before entering contempt order did not violate due process where no party requested it). The district court in the present matter held an evidentiary hearing over several days, meaning that it "took every step necessary" to comply with due process. *Epic Games*, 161 F.4th at 1191.

Oregon posits, again with no support from any case, that due process required the district court to schedule *sua sponte* a fourth hearing date with "cross-examination and an opportunity to present rebutting evidence" before it could even consider the Eleventh Report. Dkt. 24.1, at 36. Multiple cases hold that a court need not afford a *single* "full-blown evidentiary hearing," much less *four*, before civil contempt may be imposed. Oregon points to no cases whatever where one evidentiary hearing was actually afforded to a contemnor, but a second, third, or fourth was deemed required by due process. Oregon points only to the *Bagwell* case as authority on its due process claims, but *Bagwell* is a case about *criminal contempt*, proceedings with a far higher due process standard, and thus with little guidance as to the due process required in civil contempt matters. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 823 (1994) ("[W]e conclude that the fines are criminal. . . ."). The consensus among Ninth Circuit cases is that a single evidentiary hearing is sufficient due process—often, more than enough—in civil contempt proceedings.

### D. Even Ignoring the Court Monitor's Eleventh Report, the Contempt Order Should Be Affirmed as the District Court Could and Did Rely on Hearing Testimony in Rejecting State's Defense

In its June 2025 contempt order, the district court held that "based on the testimony provided at the status hearing on January 24, 2025, and during the contempt hearing on March 12 and 13, 2025, the Court finds that defendants have

not taken all reasonable steps to comply, and DRO has demonstrated by clear and convincing evidence that defendants are in contempt." 1-ER-33 (emphasis added). This determination was the crucial finding supporting the contempt finding and rejecting the state's only defense. The transcript accumulated across those three dates stretches over more than 350 pages of record. 2-ER-42–253 (March 12); 2-ER-254–313 (March 13); 3-ER-316–405 (January 24). The Ninth Circuit cannot assume the district court disregarded three days' worth of evidence and argument, where the district court announced it was relying on that hearing testimony to reject the state's only defense to contempt.

When an appeal is brought against a particular judgment or order, an appellate court may "affirm based on any ground supported by the record." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008). In a contempt proceeding, consideration of evidence that should not have been considered will not justify reversal if the error was harmless. *F.T.C. v. Am. Nat. Cellular*, 868 F.2d 315, 321 (9th Cir. 1989). Even if the Court believes the Eleventh Report should not have been considered, the Court may affirm the district court's order because the district court pointed to ample evidence in the record outside the Eleventh Report and because the voluminous hearing record supports the finding of contempt. Oregon's brief fails to cite any law in favor of its incorrect

premise that reversal or remand is automatically required, even assuming it establishes the impropriety of considering the Eleventh Report.

Before Oregon may seek reversal of the district court's order, it must show that the admission of the Eleventh Report led to an erroneous finding of contempt. Oregon cannot do so because they failed to even state the basic elements of a substantial compliance defense. Defendants "have not described any new evidence that they could present at a hearing, nor any existing evidence that they would challenge, if such a hearing were to be ordered." *Peterson*, 140 F.3d at 1324.[4] Remand for a new hearing and new proceeding would be pointless if the contempt decision would have been sustained with or without the Eleventh Report.

### E. Oregon Failed to Meet Its Legal Burden and Demonstrate a "Substantial Compliance" Defense at the Contempt Hearings, With or Without the Eleventh Report.

At the time of the June 2025 order, Oregon had been violating the permanent injunction in this case for the vast majority of the prior seven years, including 90% of the five years preceding the March 2025 hearing. Oregon conceded that it was in

[4] Most portions of the Eleventh Report cited by the district court noted recent improvements since the March hearing dates and were helpful to the state. *See generally* 1-ER-31–32 (relying on Eleventh Report to illustrate improvements in March and April 2025 in the waiting list and improvements in the time spent waiting for release by certain detainees found "guilty except for insanity" (GEI)); SER-32 (showing a shrinking waitlist in April 2025 and reduced waitlists for GEI detainee releases). Without the eleventh report, the district court would have relied only on data from the March 2025 hearing, which was worse for the state.

violation of the permanent injunction at the outset of the hearing process. DRO had, by stipulation, borne its burden to show that Oregon was violating the permanent injunction. *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir. 1999) (movant has burden to show contemnor "violated a specific and definite order of the court"). The burden then shifted to the Defendants to assert a defense for their noncompliance.

At the hearing, Defendants alleged that they had made "all reasonable steps" to comply with the permanent injunction, one of two elements of the substantial compliance defense. In order to assert a substantial compliance defense, Oregon had to show that the "alleged contemnor that has taken all reasonable steps to comply with applicable court orders, resulting in merely technical or inadvertent violations of those orders." *Coleman*, 131 F.4th at 956. Here, Oregon failed to show that it had "taken all reasonable steps" and failed to show that any remaining noncompliance was "merely technical or inadvertent." It never discussed, much less demonstrated the latter element to the district court. Presumably, if Oregon had a colorable claim that it had actually proved its defense, it would have appealed on the ground that the court abused its discretion in granting the contempt motion. It did not. The consideration of the Eleventh Report did not alter the outcome of this analysis.

1. <u>In January 2025, Oregon had failed to achieve compliance with the Permanent Injunction, with admission delays of almost a month.</u>

Defendants' own data showed that, as of January 2025, the average delay in admission to the state psychiatric hospital for detainees found unable to stand trial was *twenty-nine days* across all detainees requiring hospital placement. 1-ER-31.[5] Oregon continued to be out of compliance in March and April 2025, with average delays of more than twenty days in both months. *Id.* Oregon's noncompliance was not mere technical or inadvertent noncompliance. The typical detainee faced a delay more than four times as long as the permanent injunction permitted in January 2025. 1-ER-31. Where a defendant "did not come close to actual compliance," the "substantial compliance" defense does not apply. *Coleman*, 131 F.4th at 956. The defense protects a contemnor who "has achieved ***<u>near-total compliance</u>*** through the exhaustion of all reasonable efforts." *Id.* (emphasis added). The uniform and extensive delays for all detainees requiring hospitalization go well beyond "a few technical violations" that may yet permit a "substantial compliance finding. *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993); *Vertex Distrib., Inc. v. Falcon Foam Plastics, Inc.*,

[5] The State's brief asserts instead that it was in "substantial compliance" with Dr. Pinals recommendations, not in substantial compliance with the permanent injunction. Dkt. 24.1, at 46. Oregon was held in contempt for violating the permanent injunction, not for failing to implement Dr. Pinals' recommendations. Dr. Pinals' recommendations were not the "specific and definite order of the court" at issue. 179 F.3d at 1239.

689 F.2d 885, 892 (9th Cir. 1982) (substantial compliance found where plaintiff could only identify a single episode of noncompliance). During the relevant time period particularly examined by the Court, Oregon's noncompliance with the permanent injunction was essentially universal. The degree of noncompliance was dramatic, running from three to four times the permitted interval for prompt admittance. Oregon failed to achieve even partial compliance, much less the "near-total compliance" required for a substantial compliance defense as of the contempt hearings in January and March 2025.

2. Oregon did not take all reasonable steps as documented by the lack of sufficient beds, funds, and staff as well as failure to take all steps recommended by the Court Monitor to improve compliance.

Oregon did not demonstrate that it had taken all reasonable steps to protect the detainees from violation of their constitutional rights. The district court found that Oregon's concessions at the hearing that "they lack resources, capacity, services, etc., are concessions not only that defendants are in ongoing violation of the Permanent Injunction but likewise that they are in contempt." 1-ER-33. The law of this circuit and the law of this case is that the "[l]ack of funds, staff or facilities cannot justify the State's failure to provide [such persons] with [the] treatment necessary for rehabilitation." *Oregon Advoc. Ctr.*, 322 F.3d at 1121. Yet Oregon conceded at argument in March 2025 that their "all reasonable steps" claim disregarded the possibility of greater spending, staffing, or beds. 2-ER-292

(argument from counsel alleging "defendants are taking all reasonable steps *without additional funding or additional authority from the legislature*" and that there are "issues of the limit of a state agency's power when funded by the legislature") (emphasis added). Dr. Pinals testified that "an area partially in the defendants' control is adequate staffing." 3-ER- 396. She likewise agreed that the state legislature had been a "barrier to getting enough funding." 3-ER-397.

The failure of a state legislature to appropriate specific monies to a particular project or endeavor is not a defense to contempt. *Hook v. Arizona Dep't of Corr.*, 107 F.3d 1397, 1403 (9th Cir. 1997), *as amended* (Apr. 22, 1997); "[F]inancial constraints do not allow states to deprive persons of their constitutional rights." *Stone*, 968 F.2d at 858. Defendants did not put forward evidence that the agency was bankrupt or "financially incapable" of paying for mental health services. *Id.*

Defendants agreed the delays in admission of detainees represent a resource issue, relating to the lack of funds and beds. Dr. Walker, the then-acting superintendent of the state psychiatric hospital, identified as a primary reason for noncompliance that the hospital "had a fixed number of beds and . . . we can't admit somebody until we discharge somebody." 2-ER-152. Dr. Walker also agreed that another reason for noncompliance was the "lack of available placements for patients to discharge to from the Oregon State Hospital." 2-ER-153. Dr. Pinals said the development of such a community mental health structure was the "best

prevention strategy" for keeping people with serious mental illness out of the criminal system. 3-ER-397.

The Oregon mental health authorities party to this case were responsible for the creation of those placements. Dr. Sejal Hathi, one of the defendants named in this case, is the head of the Oregon Health Authority. The Oregon Health Authority is, among other things, the primary state agency in charge of the behavioral health system in Oregon. ORS 426.500. Dr. Hathi agreed at the March 2025 hearing that the state's "future compliance depends" in part "on the ongoing effort to build capacity in the community" by OHA. 2-ER-251; *see also* 2-ER-176–77 (Dr. Walker states that "the work that we're doing to expand access to treatment in the community I think is where we have the most opportunity" to foster compliance by freeing up hospital beds).

Oregon could not "right-size" its community mental health program in part because it had never studied the question. A 2024 study first identified a need for 3700 more behavioral health beds in Oregon, but Oregon was unable to point to any previous study establishing the scope of need for mental health placements in the state. 2-ER-228–229; 2-ER-230–31. Where Oregon mental health authorities oversaw the capacity and resources of the state hospital and the capacity and resources of the state mental health system as a whole, the failure to provide adequate beds, resources, and funding could not function as a defense to contempt.

Oregon, prior to 2024, did not even know how many beds it needed nor how much funding it needed in order formulate such a request. The district court therefore reasonably found that Oregon had not "persuasively explained why adding more staff, funding, and capacity in anticipation of this increased need was impossible." 1-ER-35. Oregon's contempt defense failed because put forward a proposed defense that had no legal support. It blamed its lack of resources on the state legislature, hoping the argument would absolve it from responsibility.

Even leaving aside the core issues of resources and capacity, Oregon's evidentiary showing often demonstrated that its efforts were belated, haphazard, or had not even happened. A contemnor who failed to act for months "did not act with reasonable dispatch" and thus failed to take all reasonable steps. *Stone*, 968 F.2d at 857. For instance, Dr. Walker testified that Oregon had found certain inefficiencies in how particular patients ready for discharge were released and initiated changes to that process on March 3—*nine days before the hearing*. 2-ER-162. Dr. Pinals had been asking the state to consider how to reduce the large numbers of people waiting for release at the hospital since at least 2023. 2-ER-496 ("[A]n effort to discharge patients who do not need a hospital bed should be a high priority for the defendants."). The state also presented evidence about improved accountability for mental health outcomes in contracts with Oregon counties and certain Medicaid administrative bodies (coordinated care organizations, or CCOs),

when the contracts had not even been signed as of March 2025. 2-ER-221; 2-ER-238. Contract amendments had been recommended by Dr. Pinals in her June 2022 Second Report. 3-ER-476–481.

At the March 2025 hearing, the state pointed to future developments in the capacity of the community mental health system that might happen years in the future. 3-ER-604-08 (state's exhibit listing planned placements, including a community substance use placement projected for occupancy in June 2026, transitional housing for occupancy in August 2027, and community supported housing with a projected occupancy date in June 2028). Dr. Walker's March testimony also noted Oregon was "bringing two new additional evaluators on board this month and one more in May." 2-ER-165. She acknowledged that hiring even more evaluators "probably clear the backlog [of unevaluated patients] a couple of months more quickly." 2-ER-166. In the closing arguments, the district court specifically noted, "I'm curious about the timing of the efforts that have been made." 2-ER-281. The "all reasonable steps" element of the substantial compliance defense requires a contemnor to prove that it *"has taken"* those steps, not to allege that it may take steps in the future. *Coleman*, 131 F.4th at 956 (emphasis added).

Dr. Pinals noted the ebb and flow of the intensity of the state's efforts, testifying at the March 2025 hearing that "in some aspects there was a lack of urgency" from the state and that there "have been waxing and waning

commitments from different leaders" over her four years of involvement in the case. 2-ER-102; 2-ER-104. In one of the primary non-hospital alternatives for mental health restoration, the Northwest Regional Re-entry Center (NWRRC), Dr. Pinals' Tenth Report indicated that there "needed to be more active utilization management to ensure that people are not remaining there unnecessarily." 2-ER-529. She reiterated at the hearing that the center "may be able to serve a few more" patients. 2-ER-120. Considering the years-long noncompliance of the state, Oregon's evidence—showing many recent steps taken only years after the original recommendation and relying on projected future steps that might or might not occur—demonstrated that it had not taken all possible steps. Live testimony at the hearing from the neutral expert verified the inconsistent efforts of state leaders. The record abounded with evidence that the state did not take all reasonable steps long before the Eleventh Report was written.

### F. The Legal Term "Substantial Compliance" Does Not Render the Remedial Order Vague

Oregon's brief raises concerns about the use of the terms "substantial compliance" in the district court's directives. Dkt. 24.1, 45–46 (objecting to use of term "substantial compliance" in defining how Oregon can purge civil contempt. As discussed above with regards to the phrase "all reasonable steps," *see* discussion *supra* Section V.B.2., courts use legal terms of art in injunctions routinely and without prejudice to any party. *Jeff D.,* 643 F.3d at 280 ("The court

ordered the Defendants to take all steps necessary to bring themselves into substantial compliance."); *Lopez-Perera*, 438 F.3d at 935 (proper to use "specific legal term"); *Thomas* 227 F.3d at 925 ("frivolous" to claim "elemental legal term[]" was vague). The district court used a well-understood legal term of art to articulate a well-established standard.

The district court determined that it would assess fines in the amount of $500 per detainee per day the detainee is held past the seven-day deadline in the permanent injunction. 1-ER-40. Defendants will no longer be fined when detainees no longer spend more than seven days in jail after the signature of an order finding them unable to stand trial. This standard is sufficiently definite. *United States v. Bright*, 596 F.3d 683, 696 (9th Cir. 2010) (court that "expressly stated" the conditions under which contemnor "would no longer be in contempt" adequately defined the requirement). The seven-day requirement is and remains clear.

Oregon appears to object only to the use of the term "substantial compliance," as if it were vague or ill-defined. 1-ER-40. "Substantial compliance" is a defined and well-known legal term, in which "merely technical or inadvertent violations of those orders" remain and the contemnor has taken all reasonable steps to comply. *Coleman*, 131 F.4th at 956. "Substantial compliance" comes about where a party has "achieved near-total compliance through the exhaustion of all reasonable efforts." *Id.* The meaning is clear, and consistent with the permanent

injunction itself: Oregon must ensure the prompt admission of detainees within seven days of the issuance of an order finding them unable to stand trial.

Whether Oregon achieves "substantial compliance" may depend on various factors, including: the *number of detainees* not being timely admitted, and the *number of days* each remains in jail over seven days. Either of those variables may be high or low. In addition, based on the established rule that exceptions can only be "technical or inadvertent," the state's substantial compliance may also depend on the specific circumstances surrounding the delay. The court does not need to, and could not, define every possible scenario that would constitute substantial compliance. In any event, if Oregon arrives at arguable "near-total" compliance, any fines assessed will be miniscule, rendering the stakes of any future dispute nominal. The district court did not err by using the common term "substantial compliance." Oregon knows it must admit detainees in seven days to avoid fines. If it achieves that goal with only a few "technical" or "inadvertent" remaining violations, it will achieve substantial compliance.

### G. The Court Reasonably Articulated Its Basis in Establishing Fine Amounts

A district court has extremely broad latitude to set the amounts or conditions for fines, once a contemnor is determined to be in contempt of court. A district court can set fine amounts with broad latitude, required only to issue a written explanation showing "reasoned consideration to the probable effectiveness of any

suggested sanction in bringing about the result desired." *Parsons*, 949 F.3d at 457; *Whittaker Corp*., 953 F.2d at 516 (fine order must show court "considered the harm threatened and the effectiveness of prior injunctive relief"); *see* discussion *supra* Section V.B.1. The court's opinion demonstrates such reasoned consideration in setting the amount of the fines. 1-ER-36.

The district court provided a clear explanation of its rationale for the fine amounts, relating it to the fine amounts leveled in a similar case. "[T]he district court explained why it was holding Defendants in contempt and why it selected the prospective fine schedule." *Parsons*, 949 F.3d at 457 (denying the contemnor's appeal as to the fine amounts). The district court drew on the similar experience of a neighboring district court handling one of a handful of comparable cases in the nation. 1-ER-36 ("The Court finds $500.00 per class member per day to be an appropriate monetary sanction based on the $500.00 per class member per day sanction issued in *Trueblood*."). *Trueblood* refers to a similar long-term proceeding challenging the state of Washington's failure to admit detainees for restoration services after they are found unable to stand trial. *Trueblood v. Washington State Dep't of Soc. & Health Servs*., No. C14-1178-MJP, 2016 WL 3632486, at *1 (W.D. Wash. July 7, 2016), *clarified on denial of reconsideration*, No. C14-1178-MJP, 2016 WL 4384861 (W.D. Wash. Aug. 17, 2016). In *Trueblood*, the court likewise

fixed a similar $500 per day per detainee schedule after finding Washington in contempt. *Id.*

The district court's explanation of its rationale for the fines was quite a bit *more developed* than the one approved in *Parsons*. 949 F.3d at 457. Oregon does not deny that the district court provided a rationale, but disagrees with the rationale. Oregon is not entitled to *de novo* review of this question. Oregon failed to identify any fine rationale or amount other than zero that would satisfy itself, either in its arguments to this court or the lower court. The district court provided *some* "reasoned consideration" of the fine amount, ending the inquiry on appeal.

### H. The District Court Did Not Unconstitutionally Delegate Judicial Authority to the Court Monitor

The district court generally stated that it would make the neutral expert into a court monitor, but the contempt order did not delegate any function to the court monitor or explicitly give the court monitor any authority, other than to appoint her own staff. 1-ER-38.[6] Appointing staff is not a uniquely judicial function, nor are

---

[6] Oregon's brief also points to two subsequent court orders from which it did not file a notice of appeal. Dkt. 24.1, at 62–63 (citing 1-ER-2–3). Those orders were not timely appealed and are outside the scope of this appeal. Fed R. App. Pro. 3(c) (requiring a party to designate in its notice of appeal the "judgment –or the appealable order—from which the appeal is taken"); *Griffin v. Gomez*, 741 F.3d 10, 18 (9th Cir. 2014) (where litigant failed to appeal from issuance of separate order, "we treat it as valid for the purposes of this litigation").

Alternately, Oregon *sought* the relief issued in the orders it challenges and should be estopped from challenging the relief it requested from the district court. SER-11

orders increasing payment to a court monitor cabined by any particular law. *Melendres*, 113 F.4th at 1137 (provision of order increasing payment for court monitor for assuming new duties did not require clarification).

1. <u>The Contempt Order Does Not Vest the Court Monitor with any Judicial Function</u>

Defendants claim that the district court was obliged to limit the function of the court monitor, citing *Melendres*. Dkt. 24.1, at 62. In *Melendres*, the Ninth Circuit approved very specific provision of authorities to the monitor: that the monitor "maintains independent authority to make the ultimate decision" regarding complaint handling and to "make certain operational decisions" for the sheriff's office, saying that the district court maintained clear ability to oversee those decisions. *Melendres*, 113 F.4th at 1138. The need for clarity as to the court's oversight of the court monitor in *Melendres* flowed from the radical power of the court monitor to direct action within the sheriff's office. *See Armstrong v. Brown*, 768 F.3d 975, 988 (9th Cir. 2014) (order specifically permitting court monitor "unilaterally and conclusively to make findings of fact and conclusions of law"

---

(motion from appellants for an order requiring them to "submit their proposed fine calculations . . . to Dr. Pinals" and to include in their request to the court "Dr. Pinals' decisions as to any requested exclusions"); SER-16 (defense counsel promises court Oregon "will submit the proof to the court monitor and let her decide whether a fine would have a coercive effect under the facts of the given situation"); *United States v. Turrey*, 135 F.4th 1183, 1186 (9th Cir. 2025) (litigant who "invites error" cannot complain of that error on appeal).

violated law). Here, the district court did not vest the court monitor with any specific new function that would require remand to clarify such a role.

*Melendres*, in fact, points out that an "emergency motion to the district court for expeditious judicial review of the Monitor's decision" or a motion to clarify the provisions of the order would be adequate protections for the sheriff against overreach. *Id.* at 1139. Oregon concedes that it "is impossible to determine whether the district court exceeded that authority," because the district court did not announce any new function for the court monitor in the court orders appealed from (aside from hiring staff). Oregon retains the ability to raise any concerns it has with the trial court regarding any decisions the court monitor might make, should any such power be delegated in the future. Oregon also may appeal future orders delegating new powers to the court monitor.

None of the orders noticed for appeal in this matter delegate any judicial function to the court monitor. The court monitor acts under the direction of the court, and the district court has never refused to review any decision of the court monitor.

## VI. Conclusion

Oregon filed this appeal, attacking nearly every element of the contempt order. The only point omitted from Oregon's appeal is the foundational legal question it claimed to address in the contempt proceeding: whether the state had

taken all reasonable steps to come into compliance with the permanent injunction. The state has not sought to appeal the core legal question of this case because its neglect of an essential constitutional duty is manifest. The district court acted properly in issuing a carefully crafted remedial order trying to redress persistent contempt of a long-standing permanent injunction and years of constitutional violation.

Lost in the state's discussion of the unfairness of this process to Oregon is the unfairness of six years of people in extreme psychiatric crisis being left in jail cells without assistance or adequate care. According to Oregon, that people were left in those cells for weeks and months due to the state's errors and inaction constitutes a mere "hiccup." Dkt. 24.1, at 50. The state criticizes the district court's "impatience" in responding reasonably to years of noncompliance. Dkt. 24.1, at 22. Two people in psychiatric crisis died while waiting for the state to accept them. 2-ER-126. This Court must take notice of the gravity of these wrongs, not treat them as a mere "hiccup." Seeking justice and compliance with the law after seven years is not impatience.

In issuing its remedial order, the district court appropriately focused its attention on the six years of constitutional violations and how to redress them, managing a difficult, complex process professionally. The district court provided clear notice of the contempt proceedings. The terms of the permanent injunction

were well-known. The district court provided multiple opportunities to be heard, on January 24, March 12, and March 13. The state was not unfairly surprised by the Eleventh Report as it had stipulated to the selection of the Neutral Expert to assist in compliance efforts and the routine admission of the challenged report and the prior 10 reports to inform the district court about the state's compliance.

Ultimately, the district court did not need to explain what common, well-defined phrases like "substantial compliance" or "all reasonable steps" means to Oregon. Holding any party, especially two state agencies, in civil contempt is a solemn and serious process. The district court did not do so lightly, carelessly, or without extensive process. The district court held Oregon in contempt because the state had been largely out of compliance with the permanent injunction since 2018 and had no projection for when it would return to compliance. This serious and continuing violation of the permanent injunction and the Fourteenth Amendment with no end in sight deserved no lesser sanction and should be treated with deference.

Date: March 11, 2026

/s/ Thomas Stenson

EMILY COOPER
THOMAS STENSON
Disability Rights Oregon
510 S.W. 10th Avenue, Suite 200
Portland, Oregon 97205

Tel: 503-243-2081
ecooper@droreon.org
tstenson@droregon.org

*Attorneys for Plaintiff-Appellee*
*Disability Rights Oregon*

s/ Jesse Merrithew

JESSE MERRITHEW
Levi Merrithew Horst PC
610 SW Alder Street, #415
Portland, OR 97205
Tel: 971-229-1241
jesse@lmhlegal.com
*Attorneys for Plaintiff-Appellee*
*Metropolitan Public Defender*

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 11,597 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size (14) and typeface (Times New Roman) comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Circuit Rule 32.1.

Date: March 11, 2026

/s/ Thomas Stenson

EMILY COOPER
THOMAS STENSON
Disability Rights Oregon
510 S.W. 10th Avenue, Suite 200
Portland, Oregon 97205
Tel: 503-243-2081
ecooper@droreon.org
tstenson@droregon.org

*Attorneys for Plaintiff-Appellee Disability Rights Oregon*

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2026, I directed Appellees' Answering Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: March 11, 2026

/s/ Thomas Stenson

EMILY COOPER
THOMAS STENSON
Disability Rights Oregon
510 S.W. 10th Avenue, Suite 200
Portland, Oregon 97205
Tel: 503-243-2081
ecooper@droreon.org
tstenson@droregon.org

*Attorneys for Plaintiff-Appellee Disability Rights Oregon*