Nos. 25-3868, 25-5609 and 25-5769

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

DISABILITY RIGHTS OREGON; METROPOLITAN PUBLIC DEFENDER; A. J. MADISON,

Plaintiffs - Appellees,

v.

Doctor SEJAL HATHI, in her official capacity as Director of the Oregon Health Authority; SARA WALKER, in her official capacity as Interim Superintendent of the Oregon State Hospital,

Defendants - Appellants.

# APPELLANTS' REPLY BRIEF

Appeal from the United States District Court
for the District of Oregon

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
LEIGH A. SALMON #054202
Senior Assistant Attorney General
1162 Court St. NE
Salem, Oregon 97301-4096
Telephone: (503) 378-4402
leigh.a.salmon@doj.oregon.gov

Attorneys for Appellants

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

ARGUMENT .........................................................................................1

I. The district court erroneously relied on information outside of the evidentiary record in ruling on DRO's contempt motion.........................................................................1

II. The district court abused its discretion in its imposition of contempt fines. .................................................................8

III. The district court's remedial order improperly imposes vague and unspecified requirements. ...................................16

V. The district court abused its discretion by failing to establish parameters on the court monitor's exercise of authority. ..............20

CONCLUSION ......................................................................................24

FURTHER EXCERPTS OF RECORD

## TABLE OF AUTHORITIES

### Cases Cited

*Balla v. Idaho State Bd. of Corr.*,
869 F.2d 461 (9th Cir. 1989).......................................................19

*City of New York v. Mickalis Pawn Shop, LLC*,
645 F.3d 114 (2d Cir. 2011) ................................................. 17, 18, 19, 20

*Coleman v. Newsom*,
131 F.4th 948 (9th Cir. 2025)........................................... 9, 10, 11, 12, 15

*F.T.C. v. Am. Nat. Cellular*,
868 F.2d 315 (9th Cir. 1989).........................................................8

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
702 F.2d 770 (9th Cir. 1983)....................................................... 9, 11, 14

*Fortyune v. American Multi-Cinema, Inc.*,
364 F.3d 1075 (9th Cir. 2004).......................................................18

*Hanford Nuclear Rsrv. Litig.*,
534 F.3d 986 (9th Cir. 2008)....................7

*Hoffman for & on Behalf of N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888*,
536 F.2d 1268 (9th Cir. 1976)....................16

*In re Padilla*,
222 F.3d 1184 (9th Cir. 2000)....................16

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994)....................15

*Jeff D. v. Otter*,
643 F.3d 278 (9th Cir. 2011)....................18

*Kona Enters., Inc. v. Est. of Bishop*,
229 F.3d 877 (9th Cir. 2000)....................6

*Lee v. Vanderbilt Univ.*,
No. 3:20-CV-00924, 2024 WL 2060128 (M.D. Tenn. May 3, 2024)........8

*Maggio v. Zeitz*,
333 U.S. 56 (1948)....................9, 14

*Melendres v. Skinner*,
113 F.4th 1126 (9th Cir. 2024).................... 17, 19, 21, 23

*Oregon Advoc. Ctr. v. Mink*,
322 F.3d 1101 (9th Cir. 2003).................... 14, 15

*Shell Offshore Inc. v. Greenpeace, Inc.*,
815 F.3d 623 (9th Cir. 2016)....................15

*Stone v. City & Cnty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992)....................2

*Taggart v. Lorenzen*,
587 U.S. 554 (2019)....................9

*Trueblood v. Washington State Dep't of Soc. & Health Servs.*,
No. C14-1178-MJP, 2016 WL 3632486 (W.D. Wash. July 7, 2016),
*clarified on denial of reconsideration*,
2016 WL 4384861 (W.D. Wash. Aug. 17, 2016)....................11

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009)....................2

*United States v. Rylander*,
460 U.S. 752 (1983) ....................................................................2

*United States v. United Mine Workers of Am.*,
330 U.S. 258 (1947) ....................................................................9

*Whittaker Corp. v. Execuair Corp.*,
953 F.2d 510 (9th Cir. 1992)............................................... 6, 8, 9, 12, 20

**Other Authorities**

Fed. R. Civ. P. 10(e)(2).........................................................................3

Fed. R. Civ. P. 62.1 ...........................................................................7, 8

Fed. R. Civ. P. 62.1(a)(3)........................................................................7

Fed. R. Civ. P. 62.1(b) ...........................................................................7

Fed. R. Civ. P. 62.1(c) ...........................................................................7

Fed. R. Civ. P. 65(d) ...........................................................................16

# APPELLANTS' REPLY BRIEF

## INTRODUCTION

Plaintiffs Disability Rights Oregon ("DRO") and Metropolitan Public Defenders ("MPD") largely ignore the fundamental errors at issue on appeal: Following a contested evidentiary hearing, the district court found the Oregon State Hospital and the Oregon Health Authority (collectively "OSH") in contempt based on information that was never admitted into evidence—information that included at least one *ex parte* conversation with a witness who had provided material testimony at the contempt hearing. Compounding that error, the district court appointed a court monitor without setting any constraints or parameters on the monitor's authority; ordered OSH to use "all reasonable steps" to achieve vaguely defined goals; and failed to explain how imposing fines that penalize OSH for the conduct of others will help bring OSH into compliance. The district court's multiple errors, considered alone or collectively, constitute an abuse of discretion warranting reversal.

## ARGUMENT

### I. The district court erroneously relied on information outside of the evidentiary record in ruling on DRO's contempt motion.

Indisputably, the Eleventh Report, upon which the district court relied, was never admitted into evidence. The district court held an evidentiary hearing—on DRO's motion—heard closing arguments, confirmed which

exhibits had been admitted, and took the matter under advisement. Plaintiffs do not contend otherwise. Nevertheless, the district court rejected OSH's substantial-compliance defense based on a report prepared months later concerning events that post-dated the evidentiary hearing. That report was presented to the court *in camera*, and the district court had at least one *ex parte* conversation with *a witness* concerning its contents. (ECF 620, Ex. B).

But it is axiomatic that an alleged contemnor must prove its substantial compliance defense by *evidence*. It is equally well-established that a district court "abuse[s] its discretion" if its rejection of that defense is based on "a clearly erroneous assessment of the *evidence*." *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (cleaned up; emphasis added) (describing abuse of discretion standard); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992) (discussing burdens of proof and rejecting contemnor's substantial compliance defense because it was based on "hearsay evidence that was not part of the [evidentiary] record below"); *see also United States v. Rylander*, 460 U.S. 752, 757 (1983) (alleged contemnor raising substantial compliance defense "has a burden of production"). The district court thus erred

by relying on non-evidentiary information—including at least one *ex parte* communication with a witness—to reject OSH's factual defense.[1]

Plaintiffs nonetheless contend that OSH had advance notice that the district court would rely on the report and accordingly waived its argument on appeal by not objecting or, alternatively, moving for reconsideration. That is incorrect. OSH never stipulated to the district court taking unilateral action based on Dr. Pinals's reports, nor did it stipulate that the district court could rely on those reports in resolving any future contempt proceeding. And, based on the parties' stipulations and past practices, OSH had no reason to believe that the district court would resolve DRO's contested contempt motion by relying on information outside of the evidentiary record.

Context is key. Dr. Pinals's initial appointment was the result of settlement negotiations in response to plaintiffs' initial contempt motions. (ECF

---

[1] After OSH filed its notice of appeal, the district court granted DRO's motion to supplement the appellate record with a copy of the Eleventh Report. (ECF 685). OSH mistakenly asserted in its opening brief that the district court provided no explanation for that decision. (*See* Opening Br. 24 n.8). That error was inadvertent, and OSH appreciates plaintiffs' bringing it to this Court's attention. (*See* Answering Br. 24 n.3). Relying on Fed. Rule. Civ. P. 10(e)(2), which permits supplementation when the omission was the result of "error or accident," the district court stated that it had "inadvertently believe[ed]" that including a hyperlink to the report in the contempt order was "sufficient" to make it a part of the "appellate record." (SER-6). Supplementing the appellate record, however, does not alter the fact that the district court based its factual findings on information not a part of the evidentiary record.

85, 91). Pursuant to the interim settlement agreement, the parties "agree[d] to suspend formal discovery" and to stipulate to Dr. Pinals's appointment. (4-ER-706–10). Her stipulated role was "to make recommendations to address capacity issues" at OSH. (4-ER-706–07). OSH generally agreed to implement her recommendations and, in exchange, plaintiffs generally agreed not to initiate contempt proceedings during the initial period of Dr. Pinals's appointment, subject to certain conditions. (4-ER-709–10).

The district court implemented that interim settlement agreement by appointing Dr. Pinals "to make recommendations to address capacity issues at the Oregon State Hospital." (4-ER-704–05). During this time, the parties stipulated to Dr. Pinals's continued appointment to "manag[e] ongoing discussions" and "monitor[] compliance with [her] recommendations." (SER-81). Although the parties agreed to Dr. Pinals providing "brief quarterly updates" to the district court, they also agreed that any communications preceding those reports would "be considered and treated as confidential in furtherance of settlement negotiations." (SER-82; FER-114). And OSH never agreed to the district court taking unilateral action on *ex parte* communications with Dr. Pinals.

Plaintiffs subsequently filed an *unopposed* motion to implement the recommendations in Dr. Pinals's First and Second Reports (some of which

required overriding state law), and, following a hearing, the district court entered the Order to Implement Neutral Expert's Recommendations. (4-ER-668–71; *see also, e.g.*, 4-ER-689–708 (unopposed motion)). The parties filed no motions and the district court took no action on the Third through Fifth Reports.

Instead, following additional settlement negotiations, plaintiffs filed an *unopposed* motion to amend the Order to Implement Neutral Expert's Recommendations, (ECF 380), which the district court granted, (4-ER-644–47 (Amended Order to Implement Neutral Expert's Recommendations)). And following "multiple" additional settlement negotiations, the district court modified the amended order based on plaintiffs' *unopposed* motions. (4-ER-627–34 (Second Amended Order to Implement Neutral Expert's Recommendations); ECF 411 (unopposed motion referencing "multiple settlement conferences"); ECF 367). No motions were filed, and the district court took no action on Dr. Pinals's sixth through tenth reports.

Thus, over the course of several years, the parties and the district court adhered to a specific pattern: continual mediation and settlement negotiations with no district court action absent a motion requesting specific relief. OSH had no reason to believe the district court would deviate from that established practice, especially after negotiations finally ended with DRO's motion to hold

OSH in contempt. Indeed, had the parties contemplated the district court relying on information outside of the evidentiary record in resolving the contempt motion, there would have been no need to admit evidence in the first instance. That Dr. Pinals testified as a witness and DRO submitted several of her reports as exhibits only underscores the district court's extraordinary decision to go outside of the record and communicate *ex parte* with her about whether to rule in DRO's favor.

Plaintiffs also argue that OSH waived its challenge to the district court's error by not seeking reconsideration. (*See* Answering Br. 9–11). The question of waiver, however, is not a matter of ticking boxes, and there is no "bright line rule" for determining "whether a matter has been properly raised below." *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992). Rather, this Court employs a "workable standard" that focuses on giving the district court an opportunity to "correct its errors." *See id.*

Although seeking reconsideration may be one method of affording the district court that opportunity, (*see* Answering Br. 8), such motions are disfavored and, in this case, would not have obviated the need for an appeal. *See Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) ("Although Rule 59(e) permits a district court to reconsider and amend a previous order, the rule offers an extraordinary remedy, to be used sparingly in

the interests of finality and conservation of judicial resources." (Cleaned up.)). The district court has insisted that it properly based its factual findings on information outside of the evidentiary record because OSH was afforded a hearing. (*See* 1-ER-14–15). That a hearing was held misses the point. OSH raised a *factual defense* to DRO's contempt motion, and the parties presented evidence related to that issue. Three months later, the district court rejected that defense based on at least one *ex parte* communication with DRO's only witness and new information that was never made a part of the evidentiary record. Given the disfavor accorded to motions for reconsideration, as well as this Court's functional approach to waiver, litigants should not be required to undertake futile measures to avoid waiving an argument on appeal. *See In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986, 1007 (9th Cir. 2008) (holding that this court has "discretion * * * to overlook any waiver").[2]

---

[2] Furthermore, OSH's stay motion brought the issue to the court's attention. Plaintiffs argue that the stay motion was insufficient because the notice of appeal had divested the district court of jurisdiction. (Answering Br. 9). But while the district court may have lacked jurisdiction, it was not powerless to correct its error. Under Federal Rule of Civil Procedure 62.1, "[i]f a timely motion is made for relief that the court lacks jurisdiction to grant because of an appeal that has been docketed and is pending, the court may … state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue." Fed. R. Civ. P. 62.1(a)(3). Thus, the district court was afforded the opportunity to identify its error, which would have permitted this court to remand for the district court to correct it. *See* Fed. R. Civ. P. 62.1(b), (c); *see, e.g.*, *Lee v. Vanderbilt Univ.*,

*Footnote continued…*

Finally, plaintiffs argue that, even if the district court erred, this Court should affirm because the evidentiary record "supports [the] finding of contempt." (Answering Br. 27–28, citing *F.T.C. v. Am. Nat. Cellular*, 868 F.2d 315, 321 (9th Cir. 1989)). But to find harmless error, this Court must first be "convinced" that the error "did not affect the court's decision." *F.T.C.*, 868 F.2d at 322–21 ("We will find harmless error where ample evidence supports the [contempt] conviction after the improper evidence is disregarded *and* we are convinced it did not affect the court's decision." (Emphasis added.)). Plainly, the error here affected the court's decision; all but two of its factual findings are based on the Eleventh Report. (1-ER-30–31). The district court thus abused its discretion, and this Court should reverse.

## II. The district court abused its discretion in its imposition of contempt fines.

"Civil contempt sanctions * * * are employed for two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Whittaker Corp.*, 953 F.2d at 517 (cleaned

---

No. 3:20-CV-00924, 2024 WL 2060128, at *1 (M.D. Tenn. May 3, 2024) (unpublished decision) (invoking Rule 62.1 in response to "substantial issues" raised in motion for stay, recognizing that order lacked clarity, and stating that district court would amend its order should the Sixth Circuit issue a limited remand for that purpose). Yet the district court did not do so, insisting that it did not "commit[] reversible error by relying" on extra-record information that post-dated the contempt hearing. (1-ER-14–15).

up). Here, the basis for the imposition of contempt fines was to coerce compliance with the permanent injunction. (*See* 1-ER-21–22, 36). Because courts must impose "the minimum sanction necessary to obtain compliance," *Whittaker Corp.*, 953 F.2d at 517, "a court should weigh all of the evidence properly before it" to determine whether the failure to comply "constitutes deliberate defiance or willful disobedience which a coercive sanction will break." *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 781 n.6 (9th Cir. 1983) (citing *Maggio v. Zeitz*, 333 U.S. 56, 76 (1948)); *Taggart v. Lorenzen*, 587 U.S. 554, 562 (2019) ("[A] party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction."). That is, "the court *must*, in determining the size and duration of the sanction, 'consider,'" among other things, "'the probable effectiveness of any suggested sanction in bringing about the result desired.'" *Whittaker Corp.*, 953 F.2d at 517–18 (emphasis added; quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303 (1947)).

This Court's decision in *Coleman v. Newsom*, 131 F.4th 948 (9th Cir. 2025), is illustrative. After "three decades" of stalled efforts and critical problems, the district court ordered the State of California to reduce healthcare provider vacancies in its prison system "to fixed levels" and "established a schedule of prospective conditional fines" that accumulated for each "month

that the State failed to achieve its staffing obligations." *Id*. at 952-53. The fines were calculated by doubling "the average monthly salary for each unfilled position that the State would need to fill to reach" the fixed vacancy rate. *Id*. at 965. Despite the issue not being raised by either party, this Court expressed "concern with the district court's lack of explanation or factfinding regarding the size of its fines." *Id*. Although the "basic construction" could be "understood as an attempt to shift the State's financial incentives by eliminating its savings through noncompliance," "the district court offered no such explanation for its calculations, and it made no findings or estimates about the extent of such potential savings by the State." *Id*. "In the absence of such details," this Court could not "conclude that the portion of the fines exceeding the State's monthly salary savings [was] calculated with the necessary level of precision." *Id*.

The same holds true here. Nothing in the record indicates that the district court conducted the careful analysis necessary "to ensure that" the fines (which to date have exceeded $3 million) are "optimally calculated so as to deter noncompliance without imposing an excessive penalty." *See Coleman*, 131 F.4th at 65. The district court failed to address the undisputed testimony that fines would *detract* from ongoing compliance efforts, not bring it about. (*See* 2-ER-136–37, 173). Nor did it account for OSH's diligent, good faith efforts in

implementing Dr. Pinals's recommendations—recommendations that were at least ostensibly designed to address capacity issues. (*See* 4-ER-704 (appointing Dr. Pinals "to make recommendations to address capacity issues")). *See Falstaff Brewing Corp.*, 702 F.2d at 781 n.6 (in determining sanctions courts "should" determine whether failure to comply "constitutes deliberate defiance or willful disobedience which a coercive sanction will break").

Instead, the district court summarily adopted the fine amount imposed in *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2016 WL 3632486, at *9 (W.D. Wash. July 7, 2016), *clarified on denial of reconsideration*, 2016 WL 4384861 (W.D. Wash. Aug. 17, 2016), without accounting for the significantly different record in this case. (1-ER-36); *see also Falstaff Brewing Corp.*, 702 F.2d at 781 n.6 ("[A] court should weigh all of the *evidence properly before it*" to determine whether coercive sanction will compel compliance. (Emphasis added.)); (Opening Br. 39–45). *At a minimum*, this Court should vacate the fines and remand for the district court to engage in the "factfinding and analysis necessary to ensure that * * * the fine is optimally calculated as to deter noncompliance without imposing an excessive penalty." *Coleman*, 131 F.4th at 965 (*sua sponte* vacating portion of contempt fines in the absence of an "explanation or factfinding regarding the size of its fines").

In arguing to the contrary, plaintiffs conflate two distinct issues: whether OSH took all reasonable steps to regain compliance and whether a particular sanction will bring about compliance. (Answering Br. 16–17). While there may be some factual overlap between the two inquiries, a past failure to take all reasonable steps does not mean that a financial penalty will be either effective or "the minimum sanction necessary to obtain compliance." *Whittaker Corp.*, 953 F.2d at 517. *Coleman* is again illustrative: Imposing fines "based on the average monthly salary for each unfilled position" was a reasonable "attempt to shift the State's incentives by eliminating the savings it achieve[d] through noncompliance." *Coleman*, 131 F4th at 965. Doubling that amount, however, was "not as easily understood," thereby requiring a remand for the "factfinding and analysis * * * necessary to ensure that * * * portion of the fine [was] optimally calculated so as to deter noncompliance without imposing an excessive penalty." *Id*. Plaintiffs point to nothing in the district court's decision suggesting that it engaged in that required analysis. Indeed, it is unclear what relation to compliance, if any, the per diem fine has in this case.[3]

---

[3] Plaintiffs also assert that OSH waived its argument concerning the district court's imposition of fines by not presenting it to the district court in the first instance. (Answering Br. 11–12). But OSH briefed these issues at length in its written opposition to DRO's contempt motion, and it submitted supporting evidence. (FER-94–96, 104–06 (briefing)); 2-ER-136 (Dr. Pinals's testimony regarding inefficacy of fines); 2-ER-173 (Dr. Walker's testimony

*Footnote continued…*

The district court's decision to impose fines for delays caused by circumstances beyond OSH's control—such as county jails' refusal to transport—only underscores the absence of a reasoned consideration of the requisite criteria. (1-ER-17–18). There is no dispute that OSH does not transport aid-and-assist individuals to and from the county jails, nor is there any dispute that OSH lacks legislative appropriations to establish a transportation program. Indeed, the only evidence in the record is that establishing a transportation program would undermine compliance efforts by further draining resources from OSH. (FER-36–39, 83–85, 87–90). Yet the district court held that, because OSH is responsible for *admission* within seven days, it should be held financially responsible for a distinct political entity's independent action that potentially affects an individual's constitutional rights.[4] "Conditioning an order of contempt on the performance of an impossible act, for the purpose of punishing a contemnor for its incapacity to perform the act, does not square with the Supreme Court's admonishment that '[e]very precaution should be

---

regarding same); *see also* 2-ER-274 (MPD arguing that district court "must chose a remedy" that "will achieve the end"); ECF 170 at 1 n.1 (MPD stating that "a contempt finding and/or monetary fines will have no effect on compliance")).

[4] Commitment orders in Oregon routinely direct the county jail to transport the individual to OSH. (*See, e.g.*, FER-57 (commitment order directing transportation)).

taken that orders issue * * * only after legal grounds are shown and only when it appears that obedience is within the power of the party being coerced by the order.'" *Falstaff Brewing Corp.*, 702 F.2d at 781 (quoting *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)).

Citing a footnote in *Oregon Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1122 n.13 (9th Cir. 2003), plaintiffs suggest that this Court has already held that OSH is responsible for transportation delays caused "by omissions of court staff or county sheriffs." (Answering Br. 15–16; *see also* 1-ER-17–18). But the footnote in *Mink* does not aid plaintiffs' position. The record at that time established that jails were able "to transport inmates" within one day, should OSH be willing to admit them. *Id*. at 1107. OSH argued that the district court abused its discretion by not modifying the permanent injunction "so that the seven-day period would begin to run from the date OSH *receives* a commitment order rather than the date the order is issued." *Mink*, 322 F.2d at 1122 n.13. OSH's concern was that it would not "receive notice within seven days that a state court [had] issued a commitment order and that as a result, OSH could, through no fault of its own, miss the deadline and be found in violation of the injunction." *Id*. at 1122 n.13. This Court rejected that argument, stating that there was "no evidence in the record of delays in the communication of commitment orders from the state courts to OSH." *Id*.

Twenty-four years later, the record has changed. It now includes evidence of court "delays in the communication of commitment orders" and of jails declining to transport despite there being a bed available. (*See, e.g.*, FER-9–13, 15, 22). Although it is true that the "interest of an incapacitated criminal defendant in obtaining timely treatment accrues at the moment that defendant is declared unfit," *Mink*, 322 F.3d at 1122 n.13, it does not follow that OSH should be financially punished for delays outside of its control—such as a state court's 52-day delay in notifying OSH of a commitment order or a jail's refusal to transport because of its own staffing issues, both of which have recently happened. (*See, e.g.*, FER-6–7, 15–20).

Indeed, imposing fines for circumstances over which OSH has no control renders the sanction punitive rather than coercive. *See Shell Offshore Inc. v. Greenpeace, Inc.*, 815 F.3d 623, 629 (9th Cir. 2016) ("A court's power to impose coercive civil contempt depends upon the ability of the contemnor to comply with the court's coercive order, something which may change over time." (Cleaned up.)); *see also id.* at 630 ("The civil contemnor is said to 'carr[y] the keys of his prison in his own pocket,' whereas the criminal contemnor 'is furnished no key, and he cannot shorten the term by promising not to repeat the offense.'" (quoting *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 828–29 (1994)); *Coleman v. Newsom*, 131 F.4th 948,

962 (9th Cir. 2025) ("[T]he ability to purge is perhaps the most definitive characteristic of coercive civil contempt." (Cleaned up.)). The district court abused its discretion in doing so.[5]

## III. The district court's remedial order improperly imposes vague and unspecified requirements.

Plaintiffs do not dispute that an injunction order must "state its terms specifically ... [and] describe in reasonable detail ... the act or acts restrained or required." Fed. R. Civ. P. 65(d). Instead, plaintiffs argue that the phrase "all reasonable steps" in the remedial order, (1-ER-38–39), is sufficiently specific because OSH "is already obligated to take 'all reasonable steps'" to regain compliance with the permanent injunction. (Answering Br. 18). But the

---

[5] After OSH filed its notice of appeal, (4-ER-739), the district court reversed course and "exclude[d] from the calculation of contempt fines days resulting from court clerks' failure to timely send [commitment] orders to [OSH]" and delays "resulting from the failure to transport persons from jail to OSH," if OSH could show that "they provided timely notice to the county jail, issued a constitutional rights directive to the jail, and informed the Court of the circumstances[.]" (1-ER-3; *see* Opening Br. 55–56). But the district court has yet again reversed itself and "will no longer exempt … delays caused by sheriffs and court staff." (ECF 736). The district court also retroactively imposed previously excluded fines despite lacking jurisdiction to amend the appealed money judgments. (*Id.*); *see also Hoffman for & on Behalf of N.L.R.B. v. Beer Drivers & Salesmen's Loc. Union No. 888*, 536 F.2d 1268, 1277 (9th Cir. 1976) (distinguishing between a "remission of the fine" and a "conditional suspension"); *In re Padilla*, 222 F.3d 1184, 1190 (9th Cir. 2000) (While a district court may retain jurisdiction to "implement or enforce the judgement or order," it "may not alter or expand upon the judgment.").

remedial order does not state that OSH must take "all reasonable steps" to regain compliance. Rather, it orders OSH to use "all reasonable steps" or "all reasonable efforts" towards generalized goals, such as "reduce delays" and "expedite discharges," subject to a finding of contempt for a violation of *that* order. (1-ER-38–39; Opening Br. 48–51). OSH should not be forced to speculate about what benchmarks it must achieve to comply.

Further, the district court vested Dr. Pinals with authority to determine some terms of the injunction in the first instance, raising "[s]erious constitutional questions." *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 145 (2d Cir. 2011) (finding "problematic" an injunction that vested special master with "discretion to determine the terms of the injunctions themselves"); (1-ER-38–39; Opening Br. 55). Paragraph 4(a) requires defendants "to use all reasonable steps to impose limitations on community restoration consistent with Dr. Pinals' recommendations." (1-ER-38). Paragraph 4(d) goes further, requiring that OSH "use all reasonable efforts to eliminate the backlog of forensic evaluations within a reasonable time *to be determined by Dr. Pinals*." (1-ER-39, emphasis added). Rather than clearly state what acts are required, the district court improperly delegated to Dr. Pinals the authority "to fill in the huge gaps created by [court's] vague and general requirement[s]." *See Melendres v. Skinner*, 113 F.4th 1126, 1140 (9th Cir. 2024)

(describing *Mickalis Pawn Shop, LLC*). Thus, a violation of Dr. Pinals's unspecified requirements constitutes a violation of the district court's order.

The cases plaintiffs rely on are not to the contrary. For example, plaintiffs cite *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1087 (9th Cir. 2004), for the proposition that a "district court need not 'elucidate how to enforce the injunction'" provided "the underlying injunction" clearly identifies the acts "'sought to be restrained.'" (Answering Br. 18). But, again, the issue here is not the specificity of the permanent injunction; it is the lack of specificity of the *remedial order* which imposes *additional* injunctive relief. Apart from whatever efforts OSH may undertake to regain compliance, it is now compelled to "use all reasonable efforts" to achieve a set of generalized goals, subject to the threat of separate contempt proceedings. (1-ER-38–39). And the specificity of the injunction at issue in *Fortyune*—requiring a movie theater to "ensure that a companion of a wheelchair-bound patron be given priority in the use of companion seats" until ten minutes before showtime—stands in stark contrast to the order that OSH undertake "reasonable efforts" to "reduce delays." 364 F.3d at 1087; *see also Jeff D. v. Otter*, 643 F.3d 278, 280 (9th Cir. 2011) (stating that an "action item" requiring the defendant to use "day treatment data and standards to develop recommendations for the Governor's

consideration in developing his budget decisions" "may be" insufficiently specific to permit a finding of contempt).

Plaintiffs further assert that the term "reasonable efforts" is a defined legal term of art. (Answering Br. 17). Yet plaintiffs provide no definition, perhaps with good reason. The phrase "all reasonable efforts" refers to a defense to contempt that is necessarily record dependent. It is one thing for an alleged contemnor to assert a "reasonable steps" defense and present *evidence* of the specific steps taken to achieve a specific goal. It is entirely different for a court to order a defendant to undertake *unspecified* "reasonable steps" to achieve a *generalized* goal such as "reduce delays." In the former, the obligations are clear; in the latter, they are anything but. *Compare, e.g., Balla v. Idaho State Bd. of Corr.*, 869 F.2d 461, 465 (9th Cir. 1989) (holding that requirements like "a 'systematic' program for screening and evaluation, participation of 'sufficient' numbers of mental health professionals, and implementation of a 'basic' program for identifying, treating, and supervising suicidal prisoners," were "too vague" to hold state in contempt), *and* C*ity of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) ("A directive to undertake 'appropriate' measures does not 'describe in reasonable detail ... the act or acts restrained or required,' nor does it provide 'explicit notice of precisely what conduct is outlawed.'" (Cleaned up.)), *with Melendres*,

113 F.4th at 1140 (contrasting *Mickalis* and holding that requirement that administrative investigations be completed "within 85 days of the initiation of the investigation" was sufficiently clear and unambiguous). The district court abused its discretion by ordering vague and unspecified injunctive relief.

## V. The district court abused its discretion by failing to establish parameters on the court monitor's exercise of authority.

As a preliminary matter, plaintiffs contend that OSH waived its arguments concerning the court monitor's appointment. (Answering Br. 11–12). But OSH sufficiently informed the district court that the scope of the court monitor's role was at issue. Again, context is key.

At no point during the pendency of this litigation has any party requested the appointment of a court monitor. Rather, the district court raised the issue *sua sponte* two days before a status conference by directing the parties to answer the question, "Should Dr. Pinals's role of neutral expert be changed to that of a court monitor?" (4-ER-619). OSH answered that question unequivocally: It had no position at that immediate juncture on *whether* her role should be changed, but it expressly requested the opportunity to heard on "*the parameters* of what that would look like, what her *scope of work* would be *before* a final decision is made on that." (3-ER-364 (emphasis added)). The district court thus knew that, at a minimum, the parameters and scope of the court monitor's role was at issue. *See Whittaker Corp.*, 953 F.2d at 515 (Court's

"workable standard" focuses on district court's opportunity to rule on issue.). Yet, without any notice that the court had reached a decision on *whether* to appoint a monitor, it simply did so without imposing *any* parameters, raising significant constitutional concerns. (*See* Opening Br. 52-57).[6] And, as discussed, the district court delegated authority to the court monitor to define some terms of the remedial order itself.

Plaintiffs' reliance on *Melendres*, (Answering Br. 41–42), is unavailing for two reasons. First, the authority granted to the court monitor in that case was not as sweeping as plaintiffs contend. There, the district court appointed a court monitor to make recommendations for compliance with a permanent injunction related to racial discrimination and investigations of police misconduct. 113 F.4th at 1129. The district court "underscored" that it was the "ultimate arbiter of compliance" and that any disputes about the

---

[6] That the district court has since reversed the delegation of adjudicatory authority over contempt fines to Dr. Pinals, (*see supra* Reply Br. 16 n.5), does not eliminate those concerns. As discussed in the opening brief, that delegation is emblematic of the problems created by the complete absence of guardrails on the court monitor's authority and the district court's willingness to abdicate its judicial role to a non-judicial officer. Further, plaintiffs incorrectly assert that OSH requested that Dr. Pinals arbitrate its requests for fine exemptions. (Answering Br. 40 n.6). OSH requested that it not be fined for delays outside of its control, provided it could "prove to *the Court's* satisfaction" certain criteria. (FER-118–19 (emphasis added)). In response to a question from MPD at a status hearing, the district court ordered Dr. Pinals to adjudicate whether OSH had established those criteria. (FER-120–21).

recommendations were to be "submitted directly to the Court for resolution." 113 F.4th at 1129. The district court subsequently imposed additional, specific remedial measures after finding that the sheriff had "knowingly and intentionally" refused to implement the terms of the injunction. 113 F.4th at 1129. Those measures included granting the court monitor executive authority to "make determinations and establish policy decisions" about the sheriff's misconduct complaint intake and routing processes and to "conduct[] training on investigative planning and supervision." 113 F.4th at 1131-32, 1135-36. The court provided guidance on the monitor's exercise of policy-making authority and provided a clear termination provision. *Id*. at 1131. Those orders also incorporated the provision that any disputes were to be "submitted directly to the Court for resolution." *Id*. at 1130-31, 1137.

Without addressing the propriety of those specific delegations of executive authority, this Court concluded that a "district court, relying on its inherent powers, may vest a non-judicial officer with control over *narrow* areas of a governmental defendant's operations." 113 F.4th at 1136 (emphasis added). This Court further "assume[d], without deciding, that the delegation in an injunction of executive authority to a judicially appointed individual requires provision for judicial review" and held that the order at issue provided for such review. *Id*. at 1137.

Here, by contrast, the district court conferred broad authority over OSH, *requiring* that it "implement [Dr. Pinals's] recommendations." (1-ER-38; 4-ER-628). Those recommendations have, at times, contemplated sweeping executive control over OSH that have only a tenuous relationship to compliance. For example, Dr. Pinals has articulated a desire to reduce "recidivism rates" by "building out an infrastructure" of "community health clinics" and "crisis services" that "potentially can prevent people from revolving through the criminal justice system to begin with." (2-ER-77–79, 99–100). While that is certainly a laudable goal, even Dr. Pinals admits that "on a national landscape, it has not proven yet to reduce wait lists," but that "over time it might work." (2-ER-99). And unlike in *Melendres*, the district court has provided no mechanism for judicial review over Dr. Pinals's sweeping authority. Stated differently, the court monitor's authority is not limited to implementing or overseeing *judicially* imposed directives. She is vested with the authority to determine in the first instance what course of action OSH should take, require that OSH undertake that action no matter how intrusive or tenuously related it may be to the immediate crisis at hand, and set deadlines for completion, all without any mechanism for judicial review. The district court erred in delegating such sweeping authority.

Finally, plaintiffs assert that OSH should have raised this issue again at the contempt hearing. But the purpose of the contempt hearing was to litigate plaintiffs' "motion[s] for rule to show cause why defendants should not be held in contempt, and for a remedial order." (2-ER-48). Neither plaintiff's motion called for the appointment of a court monitor. (*See* ECF 540, 557, 569). OSH had no reason to raise the issue at that hearing, nor did it have any reason to believe that the district court would not honor its request to be heard. Having raised the issue once already, OSH was not required to raise it again to avoid forfeiting its argument on appeal.

## CONCLUSION

This Court should reverse the contempt order (which includes the remedial order and court monitor appointment), the order imposing financial responsibility on OSH for the conduct of others, and the First Judgment Regarding Contempt Fines. At a minimum, the Court should remand to the district court with instructions to make the remedial order more specific, to

/ / /

/ / /

/ / /

/ / /

/ / /

impose meaningful limitations on the role of court monitor, and to make explicit findings regarding the efficacy of imposing contempt fines.

Respectfully submitted,

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General

/s/ Leigh A. Salmon

LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorneys for Defendants-Appellants
Sejal Hathi and Sara Walker

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7), Federal Rules of Appellate Procedure, I certify that the Appellants' Reply Brief is proportionately spaced, has a typeface of 14 points or more and contains 5,740 words.

DATED: May 1, 2026

/s/ Leigh A. Salmon

LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorney for Defendants-Appellants
Sejal Hathi and Sara Walker

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General
LEIGH A. SALMON #054202
Senior Assistant Attorney General
1162 Court St.
Salem, Oregon 97301
Telephone: (503) 378-4402

Counsel for Appellants

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| DISABILITY RIGHTS OREGON; METROPOLITAN PUBLIC DEFENDER; A. J. MADISON,<br><br>Plaintiffs - Appellees,<br><br>v.<br><br>Doctor SEJAL HATHI, in her official capacity as Director of the Oregon Health Authority; SARA WALKER, in her official capacity as Interim Superintendent of the Oregon State Hospital,<br><br>Defendants - Appellants. | U.S.C.A. Nos. 25-3868, 25-5609 and 25-5769<br><br>STATEMENT OF RELATED CASES |

Pursuant to Rule 28-2.6, Circuit Rules of the United States Court of Appeals for the Ninth Circuit, the undersigned, counsel of record for Appellants, certifies that since filing the Appellants' Opening Brief, OSH has filed an additional Notice of Appeal in a related case: *Disability Rights Oregon, et al. v. Hathi, et al.*, Case No. 26-491. That case involves an appeal from the Third Judgment Regarding Contempt Fines, which was issued

pursuant to the contempt order being challenged in this appeal. It has been consolidated with *Disability Rights Oregon, et al. v. Hathi, et al.*, Case No. 26-64 (appeal from the Amended Second Judgement Regarding Contempt Fines), and both cases have been stayed pending resolution of this appeal.

Respectfully submitted,

DAN RAYFIELD #064790
Attorney General
PAUL L. SMITH #001870
Solicitor General

/s/ Leigh A. Salmon

LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorneys for Defendants-Appellants
Sejal Hathi and Sara Walker

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2026, I directed the Appellants' Reply Brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Leigh A. Salmon
LEIGH A. SALMON #054202
Senior Assistant Attorney General
leigh.a.salmon@doj.oregon.gov

Attorney for Defendants-Appellants
Sejal Hathi and Sara Walker